The **OIL SHALE CORPORATION** and **Energy Resources Technology Land, Inc.**, Plaintiffs,

v.

Rogers C. B. **MORTON**, Secretary of the Interior, Defendant.

Joseph B. **UMPLEBY** et al., Plaintiffs,

v.

Rogers C. B. **MORTON**, Secretary of the Interior, Defendant.

Barnette T. **NAPIER** et al., Plaintiffs,

v.

Rogers C. B. **MORTON**, Secretary of the Interior, Defendant.

Penelope Chase **BROWN** et al., Plaintiffs,

v.

Rogers C. B. **MORTON**, Secretary of the Interior, Defendant.

Nos. C–8680, C–8685, C–8691, C–9202.

United States District Court, D. Colorado.

Dec. 19, 1973.

Warren O. Martin, Denver, Colo., for plaintiffs in C–8685.

Samuel R. Freeman, Denver, Colo., for plaintiffs in C–8691.

Fowler Hamilton, Richard W. Hulbert, New York City, James B. Dean, Denver, Colo., Donald L. Morgan, Washington, D. C., for plaintiffs in C–8680 and C–9202.

Thomas L. McKevitt, Atty., Dept. of Justice, Washington, D. C., John R. Little, Jr., Acting Regional Sol., Lowell Madsen, Dept. of Interior, Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

FINESILVER, District Judge.

These cases concern the present validity of certain oil shale claims located on the Colorado Western Slope. The Department of the Interior refused to issue mineral patents to the claim owners, asserting that the claims were declared void in Departmental contest proceedings some forty years ago. The claimants contend that the Department erred in denying patents on this basis, since the contest proceedings themselves were voided and vacated by the Secretary of the Interior in 1935.

The issues presented in this case are exceedingly complex and technical, and matters have been further complicated by the fact that these cases are in their tenth year of litigation, after a series of appeals culminating in a remand to this Court by the United States Supreme Court.

As a result, the Court is of the opinion that our discussion below will be better understood if we preface it with a brief encapsulation of our holdings herein. The Court holds as follows:

A. The denial of patents was erroneous and warrants remand to the Interior Department for reprocessing of the patent applications rejected.

B. The denial was erroneous because the contest proceedings which provided the basis therefor were vacated by the Secretary of the Interior in The Shale Oil Company, 55 I.D. 287 (1935), and are of no present effect.

C. In addition to the vacation of the contest proceedings, the Secretary and Department of Interior consistently stated, from 1935 until the early 1960's, that these old contest proceedings did not operate to render oil shale claims invalid. Also regulations were adopted and in force during this period declaring this to be the Department's official position.

D. The Department cannot now retroactively reverse its long standing position on these old contest proceedings, and the Court holds that the Government is estopped from denying patents on the basis of those proceedings.

E. This does not mean that the claimants are entitled to patents, or that their claims are valid on all grounds. We merely hold that the claims are not invalid by virtue of the old contest proceedings, and that Interior's action in denying patents on the basis of the old contest proceedings was erroneous.

F. On remand to the Interior Department for reprocessing of the patent applications, all bases for the claims' invalidity are to be considered, as directed by the Supreme Court in Hickel v. TOSCO, 400 U.S. 48, 91 S.Ct. 196, 27 L. Ed.2d 193 (1970).

G. In addition to the substantive error of Interior in denying patents on the basis of the old contest proceedings, the Departmental processing of the patent applications was procedurally defective

and warrants a remand for reprocessing to correct these procedural defects.

H. On remand for reprocessing the Administrative Procedures Act is to be employed in an adversary, evidentiary hearing on all issues, not yet decided, which may invalidate these claims. Fraud, abandonment and discovery are to be considered on remand as the Supreme Court directed in *TOSCO, supra.*

I. Since we hold the old contest proceedings to be vacated and of no present effect, we need not consider the issues of the appropriateness of judicial review of those proceedings at this time, nor of the adequacy of service of process therein. This is consistent with the Supreme Court's remand instructions. *TOSCO, supra,* at p. 58.

J. Plaintiff TOSCO, in C–8680, did not file a patent application, and is thus in a different position from that of the other plaintiffs. TOSCO seeks a determination in the nature of a declaratory judgment as to the present effect of the old contest proceedings. As already stated, we hold those contest proceedings to have been vacated and to be of no present effect to invalidate oil shale claims. Should TOSCO file a patent application however, all other issues relating to the validity of its claims will be open in the processing of its patent application, subject to proper procedural safeguards in the resolution of those other issues by Interior.

## I. INTRODUCTION AND OVERVIEW

In this consolidated proceeding plaintiffs generally seek to obtain judicial review and relief with respect to administrative proceedings within the Department of Interior concerning the validity of a number of unpatented oil shale placer mining claims located on the Green River Formation in Colorado. The subject claims were located under the provisions of the Mining Act of 1872, now 30 U.S.C. Section 21 et seq., prior to the enactment of the Mineral Leasing Act of 1920, now 30 U.S.C. Section 181 et seq.

Plaintiffs Umpleby, Napier and Brown, in C–8685, C–8691 and C–9202 respectively, seek mandatory orders compelling the Interior Department to issue patents to them on their oil shale claims; plaintiff TOSCO in C–8680, desires a declaratory judgment regarding the validity of its claims.

In the interest of brevity the recitations of specific facts respecting plaintiffs' claims are herein adopted as set forth in the Appendix to the Supreme Court's opinion in Hickel v. TOSCO, *supra,* at 400 U.S. 59 ff., 91 S.Ct. 196 and the original district court opinion in these cases, Oil Shale Corp. v. Udall, 261 F.Supp. 954 (D.C.Colo.1966).

In 1962, the Manager of the Colorado Land Office, Bureau of Land Management, Department of the Interior, rejected the patent applications of plaintiffs Umpleby, Napier and Brown. The asserted basis for this rejection was the existence of decisions, entered in contest proceedings initiated against the claims in the 1930's by the Department, declaring the claims void for failure to perform annual assessment work thereon.

The Manager's decision was affirmed by the Solicitor of the Interior Department, sitting for the Secretary, in Union Oil Co., 71 I.D. 169 (1964).

Shortly thereafter, the plaintiffs brought an action in the United States District Court for the District of Colorado seeking judicial review of these Departmental actions. Their argument on that review should be briefly sketched at this point, to make the judicial holdings thereon comprehensible.

## MINERAL LEASING ACT

The Mineral Leasing Act had forbidden location of new oil shale claims after the date of its enactment, February 25, 1920, and provided that thereafter oil shale and other fossil fuels could only be extracted on a lease basis, and the land containing such minerals could not pass into private ownership based on new claims being filed and reduced to patent.

The Act contained a "savings clause" however, Section 37 of the Act, 30 U.S.C. Section 193, which provided that claims located prior to the enactment of the Act could be reduced to patent and pass into private ownerhip, if "thereafter maintained in compliance with the laws under which initiated." 30 U.S.C. § 193.

One of the provisions of the general mining law, 30 U.S.C. § 28, provided that unless a claimant performed $100 worth of assessment work on his claim in each year, that claim would be ripe for relocation by another claimant.*

While at first blush a salutary provision, the course of recent mining history reflects that Section 37 of the Leasing Act has prompted more uncertainty and given rise to more litigation than any other provision of the mining laws.[1]

Controversy as to the interpretation of this section has surfaced mainly in connection with the necessity of assessment work to maintain oil shale claims. The series of Supreme Court decisions cited and discussed below are illustrative of the disputes and uncertainties that have prevailed in this critical area for over forty years.

Continued litigation has flowed from *TOSCO, supra,* creating an understandable and realistic uneasiness in the nation's mining industry. Certainly the interest of the United States, in the face of serious energy crises, would be better served by establishing a semblance of stability in interest in oil shale lands, rather than continuing the uncertainties created by litigation over the infinite interpretation of an ambiguous statute.**

A close reading of case law and Interior decisions, rules, and directives clearly reflects a quagmire of inconsistent holdings and interpretations. A title examiner called upon to examine the title status of pre-1920 oil shale claims and patents on such claims would have difficulty expressing a clear opinion as to claim or title status.

## PRIOR PROCEEDINGS IN THIS LITIGATION

### SUPREME COURT REMAND

In the early 1930's, the Interior Department contested a great number of oil shale claims on the grounds that assessment work had not been performed during certain years, and declared the claims void because of this non-compliance with 30 U.S.C. § 28.

In the judicial review in the district court, plaintiffs argued that these voidances of their claims in the 1930's were themselves invalid, because there had been no subject matter jurisdiction for the Department to invalidate the claims for this failure of assessment work. It was contended that the assessment work requirement was designed to allow rival locators to take over claims on which assessment work had not been performed, not to provide a basis for the voidance of these claims by the Government. Hence, the nonperformance of assessment work was not a requirement for the maintenance of a claim within the meaning of § 37 of the Leasing Act, and the Department had no jurisdiction for voiding the plaintiffs' claims on that basis.

The Court found for the plaintiffs on this issue, holding that the old contest proceedings voiding the claims were themselves invalid, because the Department had exceeded its jurisdiction in

---

* Assessment work is improvement and development work performed on claims in furtherance of eventual full scale development of the location. *See* Cong.Globe: 42nd Cong.2d Sess. 2459 (1872)

1. *See;* Legal Study of Oil Shale on Public Lands, prepared by the University of Denver, College of Law, Professors Gary Widman and Thomas Brightwell Eds., for the Public Land Law Review Commission (1969). This work is an excellent primer on the problems and complexities in this area.

** The confusion and uncertainty surrounding the issue of the validity of pre-1920 oil shale claims and assessment work is evidenced by the volume of critical commentary which has emerged. *See;* Bibliography in Appendix for citations of pertinent literature.

**114**

voiding the claims for assessment work failure. Oil Shale Corp. v. Udall, *supra*. Judge William E. Doyle based his holding on a series of Supreme Court opinions including Wilbur v. Krushnic, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930) and Ickes v. Virginia-Colorado Development Corp., 295 U.S. 639, 55 S. Ct. 888, 79 L.Ed. 1627 (1935), which were interpreted by the Court to hold that the Secretary did not have jurisdiction to invalidate claims for assessment work failure.

The Court of Appeals for the Tenth Circuit affirmed the trial court's ruling in an opinion written by Judge Seth, in which Judges Phillips and Hill joined. Udall v. TOSCO, 406 F.2d 759 (10th Cir.1969).

The Supreme Court granted certiorari, and on December 8, 1970 reversed the determinations of the lower courts in an opinion written by Justice Douglas, in which Justices Black, Brennan and Blackmun joined. The Chief Justice and Justice Stewart filed a dissent, and Justices Harlan, White and Marshall did not take part in the decision of the case. Hickel v. TOSCO, 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970).

The Supreme Court's Opinion held that *Krushnic* and *Virginia-Colorado* had been erroneously applied below: that since further location was precluded by the Leasing Act the assessment work failure could not be the basis of any relocation by a rival claimant; and that therefore the United States was the beneficiary of any claims on which assessment work had not been performed. *Id.* at p. 57, 91 S.Ct. 196. As a result the Court concluded that the Department did have subject matter jurisdiction to void claims if the assessment work performed on them did not amount to "substantial compliance" with 30 U.S.C. § 28. *Id.*

However, the Court did not expressly overrule *Krushnic* and *Virginia-Colorado*, (which fact was the basis for the dissent of Chief Justice Berger and Justice Stewart), but left a "narrow ambit" occupied by those cases in which a claim-

ant who had *substantially complied* with the assessment work requirement could shelter and preserve his claim. *Id.* at p. 58, 91 S.Ct. 196.

Taking *TOSCO* and the two older Supreme Court cases together, therefore, we take the current state of the law regarding the jurisdictional bases of Departmental voidances of oil shale claims to be this; that the Secretary *did* have jurisdiction to void claims for lack of substantial compliance with § 28, based on the holding in *TOSCO*, but *did not* have jurisdiction to void claims for only a literal, or insubstantial noncompliance with § 28, based on the holdings in *Krushnic* and *Virginia-Colorado*.

Happily, the Court's mandate on remand offers us an alternative to threading a path between these two holdings, because, the jurisdictional issue aside, there is another reason why these 1930's contest proceedings may not be conclusive of the validity of these claims. The plaintiffs, on appeal, argued that regardless of the jurisdictional basis for the old contest proceedings, these proceedings had been set aside by the Department in the forty years since their occurrence, and could not properly be the basis for the 1962 denial of patents on the claims.

This issue had not been reached in the trial or appellate courts, and accordingly the Court's remand instructions directed:

"Therefore, on remand all issues relevant to the current validity of those contest proceedings will be open, including the availability of judicial review at this time. To the extent that they are found void, not controlling, or subject to review, all issues relevant to the invalidity of the claims will be open, including inadequate assessment work, abandonment, fraud and the like. Likewise all issues concerning the time, amount, and nature of the assessment work will be open so that the claimants will have an opportunity to bring their claims within the narrow ambit of *Krushnic* and *Virgin*-

*ia-Colorado* as we have construed and limited these opinions." 400 U.S. at p. 58, 91 S.Ct. at p. 202.

We understand our mandated task to be two-pronged. First we must determine whether or not the contest proceedings' decisions voiding the subject claims are valid, and provided a proper basis for the Manager's rejection of plaintiffs' patent applications. If the old contest decisions are still valid, the issue of the availability of their judicial review at this time must be considered, and a determination made on the present validity of plaintiffs' claims in light of the old contest decisions.

However, if the old contest decisions are no longer operative, by virtue of Departmental repudiation thereof or otherwise, our second mandated task is a determination of the present validity of plaintiffs' claims, after consideration of the possibility of their invalidity on any possible ground, including abandonment and fraud.

In addition, plaintiffs assert that the Departmental processing of their patent applications was procedurally defective. We shall consider this argument after resolution of the threshold problem of the substantive basis for the patent rejections outlined above.

CHRONOLOGICAL FRAMEWORK: OIL SHALE DEVELOPMENT AND LEGAL PRONOUNCEMENTS

Once again, the chronological framework involved in resolving these issues is as follows:

*Prior to 1920:* Oil shale claims could be located in the same manner as mining claims for any other mineral. Unpatented mining claims were (and are) recognized as an unique estate in land, entitling the claimant to exclusive possession of his claim, and this estate could be enlarged to a fee simple interest if the claim were patented.

*Mineral Leasing Act of 1920:* Removed oil shale lands from subsequent private appropriation under the mining laws and provided instead for leasing of oil shale lands from the Government. Under the leasing system private persons cannot acquire ownership of mineral lands, they merely have the right to extract minerals and pay royalties to the Government therefor. Section 37 of the Act provided a mechanism for preservation of previously located claims, if maintained under the applicable mining laws.

*1920's and 1930's:* All the claims here involved, and many others similarly situated, were declared wholly or partially invalid by the Interior Department on the sole grounds that they had not been properly maintained within the meaning of § 37 of the Leasing Act because annual assessment work had not been performed on the claims.

*1930 and 1935:* Two Supreme Court decisions held that the Department's invalidations of oil shale claims for assessment work non-performance were improper. The first, Wilbur v. United States ex rel. Krushnic, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930), held that the Department could not invalidate oil shale claims for assessment work failure if the assessment work had been resumed before contest proceedings were initiated. The second, Ickes v. Virginia-Colorado Development Corp., 295 U.S. 639, 55 S. Ct. 888, 79 L.Ed. 1627 (1935), went even further, and held that the Secretary of the Interior did not have jurisdiction to invalidate claims for non-performance of assessment work, since failure to do assessment work inured only to the benefit of rival claimants, not the Government.

*1935 Interior Department Decision:* Following the decision of the Supreme Court in *Virginia-Colorado, supra,* the Interior Department took the position that its adverse decisions against oil shale mining claims for non-performance of assessment work had been ineffective to invalidate the claims. The Secretary's position was stated in The Oil Shale Company, 55 I.D. 287 (1935), in which he expressly overruled Departmental decisions in conflict with *Virginia-Colorado.* Thereafter, the Depart-

ment issued patents for a number of oil shale claims which had been invalidated in such proceedings as are here in issue.

*Early 1960's:* The Interior Department departed from its long standing position, and asserted that the prior administrative decisions (the contest proceedings in the 1920's and 1930's) had never been set aside, and were still effective to invalidate oil shale claims. On this ground the patent applications before us here were denied. We are reviewing that denial of patents, and will now proceed in furtherance of the Supreme Court's directive.

## II. OIL SHALE BACKGROUND

Oil shale is a fine-grained sedimentary rock. It is not technically oil nor is its organic content oil. The rock is Marlstone. The solid organic matter is a rubbery substance called kerogen. If properly processed kerogen will yield a fluid hydrocarbon substance called shale oil.[2] These sediments normally contain more than 10 gallons of oil per ton of rock to be identified as oil shale.

Shale oil can be refined into products similar to those derived from crude petroleum. Chemically the primary difference between kerogen and crude petroleum is geometric. By heating kerogen to between 500 and 900 degrees Fahrenheit and proper processing, the molecular structure yields a viscous oil (shale oil) —high in sulfur and nitrogen content. Other products are gases, water and coke. Thus, 25 to 75 percent of organic matter in oil shale can be converted to oil and gas.[3] Shale oil can be refined into most of the conventional petroleum products such as fuels for internal combustion engines, boilers or furnaces.

Sodium minerals are also by-products of shale oil operations.

Billions of barrels of untapped petroleum resources are locked in oil shale rock. In the United States alone, oil shale resources probably contain more than 2,000 billion barrels of petroleum (42 U.S. gallons per barrel).[4] The oil shale deposits of the United States can be considered collectively- as an enormous potential low-grade source of oil, hydrocarbon gas, or solid fuel. About 80 billion barrels of oil from the more accessible higher grade deposits of the central Rocky Mountains can be considered available with demonstrated methods of extraction, and at costs approaching the present-day costs of petroleum of comparable quality.

The richest and highest grade oil shale deposits extend through the Green River formation, which comprises some 896,000 acres in Colorado, 2,700 acres in Utah, and 460,000 acres in Wyoming. The most extensive deposits of high -grade oil shale are in the Piceance Basin in Colorado. Here a rich oil shale layer is 50 to 100 feet thick.

The oil shale in the Piceance Basin alone has been estimated to have a potential of 1,300 billion barrels.[5] The disputed mining claims cover 338,000 acres of land in the basin. This land contains about 100 billion barrels. Another 380,000 acres containing over 100 billion barrels are already in private hands. The federal domain, which has the most extensive and richest deposits, covers about 600,000 acres and is estimated to contain nearly 1 trillion barrels of oil; [6] approximately 75 percent of the oil shale lands in northwestern Colorado are federally owned.

2. *See;* Final Environmental Statement for the Prototype Oil Shale Leasing Program—U. S. Dept. Int. 1973 Vol. 1, pp. 5–38.

3. *See;* California Geology, December 1971, p. 240.

4. An amount about 25 times the total oil production in this country throughout all of

its history. *See;* Interim Report—Oil Shale Advisory Board to Secretary of Interior, Feb. 1, 1965, II. Background Information.

5. Final Environmental Statement, *supra* Vol. II. p. IV–1.

6. Cal. Geology, *supra*; Final Environmental Statement, *supra.*

## III. THE OLD CONTEST PROCEEDINGS ARE NOT A PROPER BASIS FOR DENIAL OF PATENTS BECAUSE OF THE CURATIVE EFFECT OF THE INTERIOR DECISION IN THE SHALE OIL COMPANY CASE

In our view, the decision of Interior in The Shale Oil Company, 55 I.D. 287 (June 24, 1935) and unequivocal and clear pronouncements by the Department for twenty-five years thereafter served to effectively establish that non-performance of assessment work would not adversely affect oil shale claims existing before the passage of the Mineral Leasing Act of 1920.

To clearly understand the import of the decision and Interior's pronouncement, a run-through of case history is helpful.

A short time after the 1920 Mineral Leasing Act went into effect, Interior initiated proceedings voiding claims on which the annual assessment work had not been performed. Interior's policy is succinctly set forth in the Krushnic Interior Department Case, 52 L.D. 295 (1930), in which the Secretary held that even though assessment work had been resumed before any government challenge was initiated, the claim owner's interest in the claim terminated automatically if he failed to perform the assessment work by the proper time.

It was argued by the Secretary that the government was not in the same position as a private party under Section 28; further, the government would not be required to relocate the claim in order to terminate the original locator's interest.

The position taken by the Secretary was not upheld by the Supreme Court and Interior's view of automatic forfeiture for failure to perform assessment work was reflected in Wilbur v. Krushnic, *supra*. This 1930 case held that a claimant did not forfeit his claim for failure to do assessment work if the claimant resumed work before "at least some form of challenge on behalf of the United States to the valid existence of the claims has intervened." (280 U.S. 306, 318, 50 S.Ct. 103, 105, 74 L.Ed. 445).

Thereafter Interior narrowly interpreted *Krushnic* to mean that the government could void a claim for failure to perform the work *if the government challenged the claim before work resumed.* This policy was expressed in the case, Federal Oil Shale Company, 53 I.D. 213, 220, and was used from 1930–1934 as justification for voiding thousands of claims.

Claimants were notified to appear at Interior Department hearings where the claim was subject to contest. Few claimants appeared at the hearings or to appeal subsequent Interior Department decisions voiding claims.

The Secretary of the Interior's annual reports for the years 1932, 1933, and 1934 reflect that contest proceedings were filed against more than 22,000 claims covering more than 2,700,000 acres and that such filings were suspended in April of 1933 pending the outcome of Ickes v. Virginia-Colorado Development Corp. in the Supreme Court. The unanimous opinion in *Virginia-Colorado* unequivocally held that the government had no authority to cancel a mining claim for failure to perform assessment work, even though the work had not been resumed at the time of challenge. The Court clearly held that Interior had no power or authority to cancel claims solely on the ground that the assessment work had not been done. The opinion did not define in detail the government's authority under the Leasing Act.

From the time of the opinion in *Virginia-Colorado* (1935) until 1960, the government repeatedly and consistently took the position that *Virginia-Colorado* held that the government could gain no interest by establishing failure by a claimant to perform the required assessment work.

Interior implemented the *Virginia-Colorado* rule in its Shale Oil Company

decision in 1935. In this decision the Secretary stated that the adverse proceedings, and the previous decisions of the Land Office canceling certain oil shale claims for failure to perform assessment work were *void*.

The decision for the Secretary interprets *Virginia-Colorado:*

"In view of this opinion of the court, the adverse proceedings and decision of the Commissioner therein in the instant case must be held as without authority of law and void. The above-mentioned decision of the Department in the *Virginia-Colorado Development Corporation* case and the instructions of June 17, 1930, are hereby recalled and vacated. The above-mentioned decisions in the cases of Francis D. Weaver and Federal Oil Shale Company and other Departmental decisions in conflict with this decision are hereby overruled. The Commissioner's decision is reversed and the record in the case remanded with instructions to reinstate the application and entry *in toto* and dispose of the same unaffected by the default in the performance of assessment labor, and if all else is found regular, to clearlist the application for patent." The Shale Oil Company, *supra* at p. 290.

In Shale Oil Company on facts similar to those in *Virginia-Colorado*, Interior Secretary reversed a decision of the Commissioner of the General Land Office which had declared a claim void for failure to perform assessment work. It recalled and vacated the contests and challenges to those claims involved in the *Virginia-Colorado* case and all other Departmental holdings inconsistent with

that case. Shale Oil Company is significant in that it represents a reversal of an expressed policy used in prior Department decisions to declare thousands of claims void for failure to perform assessment work.[7]

There is strong evidence that at the time Shale Oil Company was issued by Interior, the Interior Department was of the view that *Shale Oil* completely nullified unappealed decisions of the type reversed in Virginia-Colorado.[8]

After the decision, Interior pursued a constant course of conduct and official departmental action in issuing patents on claims which had, prior to the decision in Shale Oil Company, been declared null and void for non-performance of assessment work.

In the period 1935–1961, Interior issued patents on 106 different applications for a total of 768 oil shale claims in Colorado. Five hundred and seven of these claims, covered by 71 of the various applications, had been declared null and void prior to *Shale Oil* for non-performance of assessment work.[9]

Following Shale Oil Company in 1935, Interior administrators pursued a constant course of action and recognition in processing patent applications; none of the prior decisions based solely on the ground of non-performance of assessment work were effective to invalidate any oil shale mining claims and, to the contrary, all such decisions were nullities, regardless of whether the decisions had been issued upon default of answer or whether appeals had been pursued to the Secretary.[10]

The record is clear that his policy was expressed in correspondences, public pro-

---

7. Thereafter, understandably, many of the Department rulings were unappealed.

8. *See*; Legal Study of Oil Shale on Public Lands, *supra*. Note p. 183.

9. *See* Plaintiffs' Exhibits 95 & 96, a tabulation and map of these claims; and Plaintiffs' Exhibits 97–141, 143, 146–154, 157–171, the files and documents relating to patents on these claims, which show the Department's policy that pre-*Virginia-Colorado* voidances of claims for non-performance of

assessment work were considered vacated and no obstacle to patent.

10. *See* Plaintiffs' Exhibit 309, deposition of William Shafer, Consultant of House Interior and Insular Affairs Committee since 1965 and BLM official for ten years previous thereto, at Record pp. 4919–4923, for statement of operating procedures in Interior and BLM as of 1955–1956 respecting patenting of oil shale claims invalidated in pre-*Virginia-Colorado* contests.

nouncements, annual reports and in official action including *actual* processing of patent claims.

From 1935 to 1961, Interior consistently, publicly, advised oil shale claim owners, attorneys for claim owners, members of Congress and officials of the Department of Navy and the general public that all of the pre–1935 adverse decisions against oil shale claims for non-performance of assessment work were null and void and were no impediment to patent; further non-performance of assessment work did not adversely affect the oil shale claims that had been challenged, irrespective of whether the adverse decisions had been rendered upon default or whether efforts had been made to appeal adverse decisions of the Land Commissioner to the Secretary of the Interior or to the Courts.

Shortly after the *Shale Oil* decision, inquiries began to reach Interior as to the meaning and effect of that decision. In a letter dated July 17, 1935, the Commissioner of the General Land Office responded to such an inquiry, which had been received from Representative Edward Taylor of Colorado, as follows:

"Under date of June 24, 1935, the Department, in the case of the Shale Oil Company, Denver mineral application 042552, recalled and vacated its decision in the Virginia-Colorado Development Corporation case and overruled its previous decisions in conflict with the decision of the Supreme Court. The Supreme Court having held that there is no authority of law for a proceeding by the Government against oil shale placers on the grounds stated above, and *the Department having overruled all its conflicting decisions, it seems obvious that any declaration that such claims were null and void, heretofore made by this office solely upon that ground, are without legal effect and void.*" Plaintiffs' Exhibit #175, Record p. 2011 [Emphasis Supplied]

On October 31, 1935, Acting Secretary of the Interior West wrote to the Secretary of the Navy on this point. He stated:

"The adverse proceedings involving all of the said claims [oil shale claims located within the Naval Oil Shale Reserves in Colorado and Utah] were based upon a charge that annual assessment work had not been performed upon the claim or claims involved for a stated assessment year and that work had not resumed thereon. . . . *All previous action taken upon such charges in the cases referred to therefore is without effect and void.* Pl. Ex. # 176, Record p. 2013 [Emphasis Supplied]

As an example of the opinions given claim owners' attorneys by the Land Office Commissioner, the following letter, dated April 7, 1936, is representative:

"In view of the Supreme Court's decision and the action taken by the Department [i. e. *Shale Oil*], *it is clear that a declaration holding a mining claim to be null and void because of failure to perform the annual assessment work is without effect and that the owner of the claim would still be entitled to resume work on the claim in the same manner as if no adverse decision had been made.* The decisions of this office in the cases referred to in your letter were based solely on the ground of failure to perform the annual assessment work on the claims." Pl. Ex. 183, Record p. 2029. [Emphasis and explanation supplied]

The same position was held in 1940, as can be seen from the following memorandum from the Land Office Commissioner to the Denver Registrar, dated March 30, 1940:

"In view of the rulings made in the case of Ickes v. Virginia-Colorado Development Corporation, decided June 3, 1935, and in the case of Shale Oil Company, decided June 24, 1935, *the previous decisions of the Department*

*declaring oil shale placer mining claims forfeited because of the failure of the claimants to perform the. annual assessment work or to resume work before a charge to the valid existence of the claim was made, were held to be without force and effect."* Pl. Ex. 82, Record p. 1792. [Emphasis supplied]

In 1946, Acting Secretary of the Interior Chapman responded to an inquiry from Senator Myers respecting the validity of certain oil shale claims declared invalid in 1931 for assessment work failure. In a letter dated March 21, 1946, the Acting Secretary stated:

" . . . However, in the case of the Oil Shale Company (55 I.D. 287, 290), decided on June 24, 1935, the Department recalled and vacated its action in the Virginia-Colorado Development Corporation case (53 I.D. 666), and overruled its action in other cases, including this one." Pl. Ex. 204, Record p. 2070.

The Associate Solicitor of the Interior Department wrote the following memo to the Regional Solicitor at Denver on December 3, 1959, setting forth the Department's position regarding the pre-1935 contests:

"In view of the Supreme Court decisions mentioned, the Department, in its decision of June 24, 1935, in the Shale Oil Company case (55 I.D. 287) held that in that case the Commissioner's decision was without authority of law and void; recalled and vacated certain cited departmental decisions and the departmental instructions of June 17, 1930 (53 I.D. 131); and overruled 'other departmental decisions in conflict with this decision' *Thus in effect the decision of June 24, 1935 [Shale Oil] recalled and vacated all departmental decisions declaring oil shale placer claims null and void solely for failure of the claim owner to do the assessment work, thus leaving the claims as if they had never been contested."* Pl. Ex. 215, Record p. 2103 [Emphasis and explanation added]

Finally, as late as 1963, we find the following statement from the assistant Secretary of the Interior of the Department's position, in a letter to Senator Anderson of August 29, 1963:

"Following the 1935 decision of the Supreme Court . . . the Department dismissed those contests which were based solely on the charge of assessment work . . . The files contained numerous letters, memoranda, and instructions showing that the position of the Department, as stated in the Shale Oil Company case, was unchanged until about 1958. During this time all prior adverse decisions, based on assessment work, were ignored, and many patents were issued without any question being raised as to the finality of the Shale Oil decision in cancelling all prior decisions which were based on assessment work alone." Pl. Ex. 211, Record p. 2087.

These examples, culled from the scores of statements in correspondence and memoranda introduced into evidence and appearing in the record, are representative of the Interior Department's stated position respecting the effect of the Shale Oil Company opinion, from the date of that opinion until the rejection of plaintiffs' patent applications.

In addition to these pronouncements, and the patenting of similarly situated oil shale claims during this period, the Department dismissed all pending contests challenging the validity of oil shale claims for non-performance of assessment work.

In a letter from the Commissioner of the General Land Office to the Denver Registrar of July 29, 1935, we find the following directive:

" . . . From the foregoing [the *Shale Oil* decision] it is clear that the adverse proceedings in this case are invalid for any purpose. Accordingly, contest No. 11823 is dismissed and the case is closed. Advise the parties hereof. Several contest cases involving oil shale placers are now pending in your office. In view of the deci-

sions referred to hereinabove, you are instructed to close out on your records and transmit to this office all contest cases involving solely the question of a failure to resume work on oil shale placers prior to the date of challenge by the United States to the valid existence of the claims, where no answer has been filed by the claimants. In all cases involving only the question of annual assessment work where answer has been filed by any of the contestees you will transmit the records to this office without action." Pl. Ex. 72 Record p. 1743.

This correspondence was followed by other memoranda of similar import. On March 30, 1940 the Commissioner again wrote the Denver Registrar giving similar instructions:

" . . . in the case of Shale Oil Company, mineral entry Denver 042552, decided June 24, 1935, the previous decisions of the Department declaring oil shale placer mining claims forfeited because of the failure of the claimants to perform the annual assessment work or to resume work before a charge to the valid existence of the claims was made, were held to be without force and effect. *In view thereof, you are instructed to close on your records all contest cases involving solely the question of a failure to perform annual assessment work and failure to resume work on oil shale placers prior to the date of a challenge by the United States to the valid existence of the claim.* A list of these cases should be transmitted to this office." Pl. Ex. 82, Record p. 1792. [Emphasis added]

Similar letters were sent to the Registrars in Salt Lake City, Utah, Cheyenne, Wyoming, and Evanston, Wyoming, on August 9, 1940. Pl. Exs. 85, 87 & 89, Record pp. 1811, 1813 & 1815.

As an example of the results of these instructions, the following memorandum was sent from the Regional Field Examiner, Salt Lake City, Utah, to the Supervisor, Branch of Field Examination, General Land Office on June 5, 1942:

"When I took charge of this Region *in January, 1935 there were 4,203 pending oil shale cases. In practically all of these cases adverse proceedings had been directed on the ground that the required assessment work had not been done on the claims.* . . . As a result of various conferences held between myself and the Director of Investigations, and as a result of some correspondence, *I was finally authorized by the then Director of Investigations on August 21, 1935, to close all of those cases in which adverse proceedings had been directed on the ground that the assessment work had not been performed, and to keep open only those cases in which adverse proceedings had been directed on the ground of non-discovery.* The cases were examined in detail, and as a result, *all except 67 were closed during the months of January and February 1936."* Pl. Ex. 91 Record p. 1817 [Emphasis added]

## IV. THE INTERPRETATION, PRONOUNCEMENTS, AND RULES OF INTERIOR, FOLLOWING VIRGINIA-COLORADO HAD FORCE OF LAW AND COULD NOT BE ABROGATED BY INTERIOR IN 1964.

While the Administrative Procedure Act was not in effect at the time these pronouncements were issuing from Interior, the Act's definition of a "rule" seems to aptly describe the policy promulgated by Interior after the *Shale Oil* decision:

"(4) 'rule' means the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure or practice requirements of an agency . . . ." 5 U.S.C. Section 551(4)

■ Whether we characterize the rules set forth by Interior following *Shale Oil* as "legislative" or "interpretive", we arrive at the conclusion that they had the force and effect of law and could not be capriciously and retroactively repudiated by Interior in 1964.

■ The statements of Interior constituted a legislative rule in that they were (a) within the granted and delegated powers of the Department to administer the public lands and the mining laws, (b) reasonable, (c) unequivocal, and (d) emanated from executives of the Department within their areas of responsibility. *See* Davis, Administrative Law, Vol. I, Section 5.03, at p. 299 (1958). This type of administrative rule has the force and effect of law and is binding on the issuing agency. Accardi v. Shaugnessy, 347 U.S. 260, 74 S. Ct. 499, 98 L.Ed. 681 (1954); United States v. Short, 240 F.2d 292 (9th Cir. 1956).

■■ If we consider Interior's pronouncements and actions to establish an interpretive rule, its force and effect as law is also supported by appropriate authorities. An agency's interpretation of its own rules and applicable statutes is "binding on the Courts", F.C.C. v. Pottsville Broadcasting Company, 309 U.S. 134, 60 S.Ct. 437, 84 L. Ed. 656 (1940). Further, as Professor Davis points out, administrative interpretations are to be given especially authoritative weight when as here; (1) the interpretative rule embodies a construction made contemporaneously with the enactment of the statute or judicial decision [or where a judicial decision necessitates administrative interpretation] or (2) when the interpretative regulation or policy is of long standing. Davis, *op. cit*, § 5.06 at p. 324ff.

The announced policies of Interior were interpretative in nature as they interpreted (1) the assessment work statute, (2) the *Virginia-Colorado* decision, (3) its own ruling in *Shale Oil*. As to the first two, the circumstances described by Davis are present, and war-rant our regarding the Department's interpretation as especially authoritative; as to the third, and most critical item, Interior was interpreting its own actions, which interpretation is of binding effect. *Pottsville Broadcasting, supra.*

■ We find that interpretation and pronouncements by the Secretary and rules promulgated thereby following *Virginia-Colorado* in conformity with the applicable mining statute had the force and effect of law to the same extent as though written into the statute. *See* Archambault v. United States, 224 F.2d 925 (10th Cir. 1955).

■ Construction of an act by the agency charged with its administration should be given persuasive effect. Ute Indian Tribe et al. v. Probst, 428 F.2d 491 (10th Cir. 1970); Alexander v. Richardson, 451 F.2d 1185 (10th Cir. 1971).

■ Finally, this Departmental rule and policy enunciated after *Shale Oil*, which vacated the old contests, dismissed ongoing contests, and removed what had been theretofore considered obstacles to patent, was a procedural rule; binding on the Department and this Court under the holding of Service v. Dulles, 354 U. S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957).

In addition to the promulgation of the Departmental rules respecting the effect of the old contest proceedings, Interior issued regulations, pursuant to its authority to administer the mining laws, setting forth the consequences of non-performance of assessment work. The version of 43 C.F.R. Section 3851.3 in force and effect until 1972 provided:

"§ 3851.3 Failure to perform assessment work.

Failure to make the expenditure or perform the labor required upon a location made before or since May 10, 1872, will subject a claim to relocation unless the original locator, his heirs, assigns, or legal representative have resumed work after such failure and before relocation."

Its companion Section, 43 C.F.R. § 3851.4 stated:

"§ 3851.4 Determination of right of possession between rival claimants.

The annual expenditure of $100 in labor or improvements on a mining claim, required by section 2324 of the Revised Statutes (30 U.S.C. § 28), is, with the exception of certain phosphate placer locations, validated by the act of January 11, 1915 (38 Stat. 792; 30 U.S.C. § 131), under which regulations were issued March 31, 1915 (Circ. 396), 44 L.D. 46, solely a matter between rival or adverse claimants to the same mineral land, and goes only to the right of possession, the determination of which is committed exclusively to the courts."

Thus, based on these regulations and the Departmental rules discussed above, mining claimants and the industry itself were justified in their belief that assessment work was solely a matter between rival claimants to the same mineral location, going only to the rights of possession thereof. Further, on the strength of these Departmental rules, it was reliably believed, as recently as December 2, 1970, that the old contests had been vacated and were no obstacle to obtaining patents for oil shale claims.[11]

The post-*TOSCO* version of the regulations, in effect since 1972 states:

"§ 3851.3 Effect of failure to perform assessment work.

'(a) Failure of a mining claimant to comply substantially with the requirement of an annual expenditure of $100 in labor or improvements on a claim imposed by section 2324 of the Revised Statutes (30 U.S.C. § 28) will render the claim subject to cancellation.'

'(b) Failure to make the expenditure or perform the labor required upon a location will subject a claim to relocation unless the original locator, his heirs, assigns or legal representatives have resumed work after such failure and before relocation.'" (37 F.R. 17836, Sept. 1, 1972)

By unequivocal pronouncements, interpretations and regulations having the force of law, Interior overruled all Departmental decisions in conflict with *Virginia-Colorado* and *Shale Oil, supra;* abandoned its policy of challenging oil shale claims for failure of assessment work; and issued 71 patents on oil shale claims declared void for assessment work non-performance in the three decades following 1935.

All claim-holders, otherwise entitled to patents, were beneficiaries of the clear, broad-based and uniform policy of Interior which removed non-performance of annual assessment work as a ground for challenge, invalidation, or denial of patent.

 No administrative appeal was necessary to remove the non-performance impediment; we expressly hold that *all* claim-holders and their successors in interest were entitled to rely on the uniform and announced policy of the Department regarding the effect of non-performance of assessment work.

 Interior's mandates effectively removed any cloud upon claim-holders' mining interest created by non-performance of assessment work. The Department could not, thirty years later, abrogate its announced policy and rules, reverse its direction, and substitute a new national policy completely in conflict with its unswerving prior policy. While an agency may reverse itself, and change its policies, it must do so without being arbitrary or unreasonable.[12] The authority to change Departmental regulations and policies does not relieve a

11. *See* Hansen 1 BLA—70–208 (GFS(M) BLA–1970–10 (Dec. 2, 1970).

12. Kelly v. United States Dept. of Interior, 339 F.Supp. 1095, 1100 (E.D.Cal.1972). *Cf.* Grain Elevator, Flour and Feed Mill Workers v. N. L. R. B., 126 U.S.App.D.C. 219, 376 F.2d 774, cert. denied, 389 U.S. 932, 88 S.Ct. 296, 19 L.Ed.2d 285 (1967); Morrison Mill Co. v. Freeman, 124 U.S.App.D.C. 334, 365 F.2d 525 (1966), cert. denied, 385 U.S 1024, 87 S.Ct. 741, 17 L.Ed.2d 672 (1967).

Department head from the obligation of following such regulations and policies *until they are officially and publicly changed*. This proposition was most recently affirmed in Nader et al. v. Bork, 366 F.Supp. 104 (D.D.C., 1973), in which Judge Gisell held the discharge of the Watergate Special Prosecutor by the Acting Attorney General illegal, because in contravention of regulations promulgated by the former Attorney General.

The question is not the power of the Attorney General or the Secretary of the Interior to change the regulations and policies of their Departments; but the basic notion of procedural due process that require government officials to follow the law as it exists until that law is changed, and to notify individuals of the change in law before it is applied against them to their detriment.

█ A mining claim is an interest in land which cannot be unreasonably or unfairly dissolved at the whim of the Interior Department. Once there is a valid discovery and proper location, a mining claim, in the language of the Supreme Court, is "real property in the highest sense."[13] Legal title to the land remains in the United States, but the claimant enjoys a valid, equitable, possessory title, subject to taxation, transferable by deed or devise, and otherwise possessing the incidents of real property.[14]

The ambivalence of the Interior Department, which has consigned plaintiffs' claims to limbo and threatens to snuff out their property rights in these mineral lands, has not reflected administrative fairness. It is timely that the unsettled title status of the instant claims be put to rest so that years of litigation and uncertainty in a crucial area can be expeditiously concluded in fairness, certainty, and clarity. We are endeavoring to chart a future course in

this proceeding that will stabilize the title status of these, and all other, unpatented oil shale claims.

## V. THE GOVERNMENT IS ESTOPPED FROM DENYING PATENTS BASED ON THE OLD CONTESTS

We find that the government is estopped from asserting the invalidity of these claims based on prior contest adjudication of failure of assessment work performance, because of the rule announced in Shale Oil Co., 55 I.D. 287 (1935), the action taken by the government implementing that decision, and the consistent course of administrative conduct in the three decades following the decision.

█ The Court is not unmindful that estoppel of the government is an extraordinary remedy, to be applied with the greatest care and circumspection, but after careful consideration of the facts surrounding these cases, and painstaking study of the relevant precedents, we believe that this estoppel is both appropriate and proper.

█ The acts and statements by which the government is estopped are: (1) the Secretary's 1935 holding in *Shale Oil, supra,* which, in response to the ruling in Ickes v. Virginia-Colorado Development Corp., 295 U.S. 639, 55 S. Ct. 888, 79 L.Ed. 1627 (1935), specifically overruled all departmental decisions purporting to invalidate oil shale claims for failure of assessment work requirements; (2) the subsequent dismissal, adverse to the government, of contest proceedings pending against these and other oil shale claims; and (3) the systematic issuance of patents from 1935 to 1962 to other oil shale claim owners whose claims had purportedly been invalidated for assessment work failure prior to *Ickes.*

13. Forbes v. Gracey, 94 U.S. 762, 767, 24 L. Ed. 313 (1876) ; Bradford v. Morrison, 212 U.S. 389, 395, 29 S.Ct. 349, 53 L.Ed. 564 (1909) ; Elder v. Wood, 208 U.S. 226, 28 S. Ct. 263, 52 L.Ed. 464 (1908) ; Manuel v.

Wulff, 152 U.S. 505, 510–511, 14 S.Ct. 651, 38 L.Ed. 532 (1894).

14. Belk v. Meagher, 104 U.S. 279, 283, 26 L Ed. 735 (1881) ; Wilbur v. Krushnic *supra* at 316 of 280 U.S., 50 S.Ct. 103 (1930).

The rules governing the application of estoppel against the government are clearly set forth in Atlantic Richfield Co. v. Hickel, 432 F.2d 587, at 591–592 (10th Cir. 1970). The government *can* be estopped by the conduct of its agents, *within the scope of their authority*.[15] The notion that the government is immune from estoppel is only true when we are presented with an attempted estoppel of the government resulting from the *erroneous, illegal,* or *unauthorized* acts of its agents. In these situations, the United States cannot be estopped.[16]

The policy considerations behind these estoppel rules are linked with those providing the rationale for sovereign immunity.[17] They reflect a desire to conserve the public treasury and resources, held by the government for the use and welfare of us all, from depletion through the oversight and error of a few individuals. But this laudable husbanding of resources cannot be carried so far as to permit the government to deal capriciously with its citizens.

Concern with this latter aspect of governmental estoppel has produced commentary highly critical of the harsh rules in this area.[18] Moreover, an increasing number of judicial decisions have demonstrated a changing attitude in the application of estoppel against the government, resulting in its more frequent availability, even where the estoppel is created by unauthorized, improper, or illegal agents' acts.

Cases in which the United States has been estopped by such conduct have appeared in the areas of tax disputes,[19] Immigration proceedings,[20] and, most significant for our purposes here, disputes relating to the administration of public lands. The two leading cases in this last category are Brandt v. Hickel, 427 F.2d 53 (9th Cir. 1970) and United States v. Georgia-Pacific Co., 421 F.2d 92 (9th Cir. 1970).

*Brandt* involved a judicial review of an administrative determination within the Interior Department voiding a competitive lease bid application for noncompliance with a formal requirement. The applicant had been assured by Interior officials that strict compliance with the requirement would not be necessary. Even though the assertion of the government personnel was unauthorized, the Court held the United States estopped by their statements.

*Georgia-Pacific* was a suit brought by the United States for specific performance of a thirty year old contract to convey certain lands to the government if the boundaries of a national forest were extended by Act of Congress. The boundaries had been so extended, and part of the land conveyed, when an administrative order returned the boundaries to their pre-contract dimensions. No further conveyances were thereafter made by the private party, nor demanded by the government for several years. The Court estopped the government from claiming that the reduction of the forest by administrative action was of no effect for purposes of enforcing the contract, and denied specific performance. Thus, estoppel was employed against the

---

15. *See*: Interstate Fire Ins. Co. v. United States, 215 F.Supp. 586 (E.D.Tenn.1963), affd., 339 F.2d 603 (6th Cir. 1964) ; United States v. Certain Parcels of Land, 131 F. Supp. 65 (S.D.Cal.1955).

16. Federal Crop Ins. Co. v. Merril, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947) ; Utah Power & Light Co. v. United States, 243 U. S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917) ; United States v. San Francisco, 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1420 (1940).

17. Berger, Estoppel Against the Government, 21 U.Chi.L.Rev. 680, 683 (1954).

18. Newman, Should Official Advice be Reliable? Proposals as to Estoppel and Related Doctrines in Administrative Law, 53 Colum. L.Rev. 374 (1953) ; Gordon, Finality of Immigration & Nationalization Determinations, Can the Government be Estopped?, 31 U. Chi.L.Rev. 433 (1964).

19. United States v. Lazy F. C. Ranch, 324 F.Supp. 698 (D.Idaho 1971).

20. Petition of La Voie, 349 F.Supp. 68 (D. V.I.1972) ; Gestuvo v. Immigration & Nat. Serv., 337 F.Supp. 1093 (C.D.Cal.1971).

United States based on an administrative act contrary to law.

It should be noted that despite the language in *Georgia-Pacific* indicating that estoppel is only available against the government when it is acting in its proprietary capacity, and not as the sovereign,[21] the *Brandt* Court, and the District Courts in the cases cited above permitted estoppels of the United States in its sovereign capacity.

Analysis of the facts before us, in the light of these precedents indicates that estoppel is appropriate here, since the administrative acts giving rise to the estoppel were authorized, legal, and proper. The authority of the Secretary to retroactively rescind the findings of completed contest proceedings was affirmed in Knight v. United Land Association, 142 U.S. 161, 12 S.Ct. 258, 35 L. Ed. 974 (1891). Thus, his action in the *Shale Oil* case was authorized and legal. Further in view of the decision in *Virginia-Colorado*; the departmental policy followed in implementing the *Shale Oil ruling*, (dismissal of contest proceedings and issuance of patents) was not only proper, but required by a legal interpretation of the Supreme Court.

It is nevertheless the contention of the government herein that the actions of the Secretary and the Department cannot be the basis of an estoppel of the government because they were erroneous and unauthorized. To sustain this characterization we must find the Secretary's obedience of the Supreme Court's mandate an "error"; the dismissal of contest proceedings which had no hope of success a "neglect of duty"; and the issuance of patents for oil shale claims which had once been declared invalid for assessment work failure an "unauthorized mistake" or "oversight", despite a valid order from the Secretary removing the patent impediment represented by these pre-*Virginia-Colorado* contest proceedings. We cannot distort the facts to make this course of administrative actions, pursuant to Supreme Court direction, into an illegal, unauthorized, or improper episode so as to invoke what immunity the government may enjoy from estoppel. These acts were authorized and legal and therefore estop the United States.

However, even if the administrative action from 1935 to 1962 were held to be *unauthorized* or contrary to law, the Court would still find estoppel appropriate in this case, for the reasons given in the *Brandt* opinion, 427 F.2d at 56:

> "Not every form of official misrepresentation will be considered sufficient to estop the government. *See* 2 K. Davis, Administrative Law Treatise, Section 17.01 et seq. *Yet some forms of erroneous advice are so closely connected to the basic fairness of the administrative decision making process that the government may be estopped from disavowing the misstatement.* Cases where the Secretary of the Interior has been held collaterally estopped from disavowing official advice include Seaton v. Texas Co., 103 U.S.App.D.C. 163, 256 F.2d 718; Chapman v. El Paso Natural Gas, 92 U.S.App.D.C. 154, 204 F.2d 46."
> (Emphasis supplied)

Ultimately, as estoppel is an equitable doctrine, we must consider the relative equities in the imposition of estoppel against the government in these cases. While it is true, as the Supreme Court observed in *Utah Power & Light*, that "a suit by the United States to enforce and maintain its policy respecting [public] lands stands upon a different plane . . . from the ordinary private suit to regain title to real property," 243 U. S. at 409, 37 S.Ct. at 391; it is also true that estopping the government by conduct *not sanctioned* by law (as was attempted in that case) is a far cry from holding the government to its word, as given in the lawful, authorized statements of its administrative agents.

Perhaps most important of these equitable considerations is the concern that we not allow transactions between the

---

21. 421 F.2d at 101.

government and its citizens to become subject to whimsical, unilateral, reversals at administrative will. The Court is not unaware of the action being taken by the Interior Department against previously issued patents for oil shale claims. Two such challenges to patent validity have been docketed in this Court already, United States v. Mobil Oil Co., C-4135 and United States v. Eaton Shale Co., C-4139.

To lay to rest the emerging specter of chaotic, piecemeal title challenge these cases may present, and to prevent the government from capriciously dealing with its citizens, the Court believes it is proper to estop the United States from asserting the invalidity of these claims based on the present revival of contest proceedings duly invalidated over thirty years ago. Mr. Justice Holmes' observation that "men must turn square corners when dealing with the government"[22] is just as true today as in 1920. But given the complexity and size of that government it would be well to remember Mr. Justice Jackson's gloss on the observation that "there is no reason why square corners should constitute a one-way street."[23]

## VI. REMAINING OBSTACLES TO PATENT: FRAUD, ABANDONMENT, ETC.

Having found that the old contest proceedings are no longer valid to effect a voidance of plaintiffs' claims, and hence that the Manager of the Colorado Land Office and the Solicitor erred in denying the plaintiffs' patent applications on that ground, we must now turn to the second part of the Supreme Court's mandate in *TOSCO*.

Unfortunately, there has been no administrative hearing or determination on the other possible grounds for the current invalidity of these claims, and as a result it is impossible for us to determine whether or not these claims are now invalid by virtue of abandonment, fraud, lack of a valid discovery or any other critical infirmity, as the Supreme Court directed.[24]

We believe that the proper forum for such a determination is an adversary, evidentiary hearing within the Bureau of Land Management for reconsideration of plaintiffs' patent applications. At such a proceeding, with full Administrative Procedures Act safeguards, all possible obstacles to patent on plaintiffs' claims should be considered and ruled upon. A meaningful judicial review could then be undertaken which would, hopefully, finally resolve the dispute over the ownership of these evermore critical oil shale lands.

The erroneous action of the Department in denying plaintiffs' patents because of the old contest proceedings requires a remand for reconsideration, and a reprocessing of the patent applications as outlined above will correct the Department's substantive error and at the same time expedite the implementation of the Supreme Court's remand instructions.

We now turn to the final point presented for our review, the procedural arguments of plaintiffs, advanced as additional grounds for the remand of these cases for reconsideration of their patent application.

## VII. PROCEDURAL DEFECTS IN DEPARTMENTAL PROCESSING OF PLAINTIFFS' APPLICATIONS

Plaintiffs, Umpleby, Napier and Brown, claim that the departmental proceedings dealing with their patent appli-

---

22. Rock Island A. & L. R. R. v. United States, 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920).

23. Federal Crop Ins. Co. v. Merril, 332 U.S. 380, at 387, 388, 68 S.Ct. 1, at 5, 92 L.Ed. 10 (1947).

24. Stipulation of parties that these issues wouldn't be considered here. *See* Joint Statement of Legal Issues filed by counsel, March 17, 1972.

cations, and culminating in Union Oil Co. 71 I.D. 169 (1964), were procedurally defective in two ways; (1) notice and an opportunity to be heard were denied them on the question of the validity of the former voidance of their claims and (2) the Solicitor wrongfully participated in both the instigation of the patent rejections and the appeal from that rejection.

The initial rejection of plaintiffs' patent applications was made by the Manager of the Colorado Land Office in 1962. The basis for his action was the existence of the decrees, entered in the old contest proceedings, which invalidated the claims for assessment work failure. No hearing, indeed no notice, was afforded plaintiffs before this decision was made.

An appeal was taken from the Manager's rejection, initially to the Director of the B.L.M., but after re-routing by the Interior Department, to the Solicitor, sitting for the Secretary by designation. At the beginning of this appeal, plaintiffs moved to vacate the Manager's rejection because of his denial of notice and hearing on the issue of the claims' validity. The Solicitor denied this motion, stating as his reason the fact that since the invalidation of the claims for assessment work failure was a matter of official record at the time of plaintiffs' application, and since both notice and hearing had been provided in the old contest proceedings, no new notice or hearing were required. 71 I.D. at 173, 174.

## I.

It should be noted at the outset that while plaintiffs had no opportunity to present evidence to the Manager on the issue of the validity of their claims, in the course of their appeal the Solicitor considered the merits of their contention that the old voidance of their cliams was itself invalid (in considering plaintiffs' assertion that the Secretary had not had jurisdiction to void their claims in the

1930's for failure of assessment work). The decade since the Solicitor's disposition of plaintiffs' appeals has been filled with judicial review proceedings considering the validity of the old contest proceedings which invalidated plaintiffs' claims some forty years ago.

The trial of these cases in this Court has afforded plaintiffs ample opportunity to present the evidence and arguments on this issue which the Department refused to hear in the course of the original patent applications, and plaintiffs do not request that we now remand these cases to the Land Office level for the purpose of correcting the procedural error of ten years ago by making a record there of the evidence exhaustively considered by this Court at trial. On this point, at least, plaintiffs and the Government are in agreement, and the Court concurs in the practical wisdom of their position.

Nonetheless the Court is of the opinion that fair and consistent treatment may have been lacking in the administrative handling of plaintiffs' patent applications, and will therefore consider plaintiffs' procedural complaints for the purpose of expediting the final departmental processing of plaintiffs' applications.

Plaintiffs contend that under the rule enunciated in Kieth O'Leary, 63 I.D. 341 (1956) an unpatented mining claim may not be invalidated without affording notice and hearing before an independent hearing officer under the Administrative Procedures Act, 5 U.S.C. Section 551 et seq. The Government argues that such a hearing is only required when the validity of the claim turns on disputed issues of fact, and is not necessary when a claim can be invalidated by resolution of questions of law alone.

We believe that the situation presented by plaintiffs' applications is critically different in that the validity of their claims hinged on questions of *fact*, or at least mixed questions of law

and fact. The rejection of these applications involved a finding that the Interior Department had not, as a matter of administrative policy and conduct, repudiated its old contest proceedings voiding these claims for assessment work failure. In light of the consistent practice of the Department regarding assessment work invalidations from 1935 until this patent rejection in 1962, discussed at length above, we cannot accept the Government's assertion that this rejection involved merely an application of law. Further, to compound this error, the Solicitor stated as his reason for denying plaintiffs' motion to vacate that there was no necessity for a hearing at the time of the patent applications *because a full hearing had been afforded in the contest proceedings in the 1930's,* yet the issue on which plaintiffs desired a hearing was the Department's conduct *since 1935.* Clearly, the matters plaintiffs wished to discuss could not have been dealt with in the old contests, since they had not yet occurred when the contests took place.

We conclude that it was erroneous for the Department to fail to apply the *O'Leary* rule, requiring an A.P.A. type hearing, before invalidating plaintiffs' claims and rejecting their patent applications, since the basis for that rejection was essentially a factual finding that the Department had not repudiated the old contest proceedings.

## II.

Plaintiffs' second procedural complaint relates to the participation of the Solicitor's Office in the instigation of these patent rejections and the appeals therefrom. The basis of this charge is a series of correspondence between the Regional Solicitor in Denver and the Solicitor's Office in Washington, D.C. which plaintiffs introduced at trial. *See* Pl. Ex. 212–215.

After the plaintiffs' patent applications were rejected instead of the appeals being heard by the Director of the B.L.M., as was the usual procedure,[25] they were routed to the Solicitor. *Union Oil, supra,* at 170. It is plaintiffs' position that this re-routing of the appeals, while not in itself improper, when combined with the participation of the Solicitor's Office in recommending patent rejection creates a totality of circumstances violative of due process under the holding of Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950), in that it represents an impermissable combination of prosecutorial and judicial functions.

Happily, the Interior Department has enacted regulations, since the *Union Oil* proceedings, which prevent any recurrence of the sort of combination of functions complained of here. Under these regulations the Solicitor's Office retains responsibility for legal recommendations and contest initiation, but an Office of Hearings and Appeals, with a Board of Land Appeals, now exercises exclusive authority over the adjudicatory aspects of hearing and review. *See* 43 C.F.R. Sections 4.400(c)&(d), 4.410, 4.411, 4.452–8, 4.452–9. (effective October 1, 1972).

It is the Court's opinion that the processing of plaintiffs' patent applications was procedurally deficient in that neither a hearing nor an impartial review were provided. This, in addition to our conclusion that the Solicitor erred in upholding the patent rejection based on the invalidations for assessment work failure, warrants a remand to the Department for re-processing of plaintiffs' patent applications.

Since we have held that the Government is estopped from asserting the assessment work contests as grounds for rejection, there is no need to correct

---

25. Hearings before the Subcommittee on Public Lands of the Senate Committee on Interior and Insular Affairs on S. 758, 'A Bill to Establish in the Office of the Secretary of the Department of The Interior a Board of Public Land Appeals, 88th Congress, 1st Session. (May 5 and 7, 1963). Testimony of Solicitor Barry, pp. 77–103.

the denial of hearing on that point by considering it at a hearing on remand. Also, the irregularities in the handling of appellate review of patent rejection have been insured of correction on remand by the new Departmental regulations cited above. But to make certain that plaintiffs are afforded full procedural protection in the course of the re-processing of their applications, the Court directs that any invalidation of plaintiffs' claims be made only after an evidentiary hearing, with full A.P.A. safeguards.

To expedite the ultimate resolution of plaintiffs' claims, and settle once and for all the question of the ownership of these oil shale properties, all factual questions relating to the validity of plaintiffs' claims should be considered at this hearing (including but not limited to, the occurrence or non-occurrence of abandonment and the presence or absence of a valid discovery), so as to facilitate orderly and prompt judicial review and an end to this overly long litigation.

## VIII. ORDER

### A. C–8680 TOSCO v. MORTON

1. All contest decisions voiding the oil shale claims owned by plaintiffs' TOSCO and ERTL, for non-performance of assessment work, were vacated by the Interior Department in The Shale Oil Company, 55 I.D. 287 (1935).

2. After these contest proceedings' decisions were vacated, the Interior Department pursued a consistent policy, evidenced by official statements, regulations, and departmental action, of asserting that these old contest proceedings had been vacated and were of no further effect to invalidate oil shale mining claims or prevent their being patented.

3. This course of conduct on the part of the Interior Department was neither erroneous, unauthorized or improper, but represented the implementation of the Interior Secretary's and Depart-ment's understanding of Wilbur v. Krushnic, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930) and Ickes v. Virginia-Colorado Development Corp., 295 U.S. 639, 55 S.Ct. 888, 79 L.Ed. 1627 (1935).

4. The Interior Department may not now retroactively reverse its official position on the validity of these old contest decisions by using the decisions as the basis for rejecting a patent application, when one is filed, by TOSCO and/or ERTL, because the decisions were vacated nearly forty years ago, and are of no present effect.

5. We do not reach the question of the sufficiency of service of process in the contest proceedings which invalidated the claims now owned by TOSCO, because (1) since we hold that those contest proceedings were vacated and are of no effect, the issue of their partial invalidity on procedural grounds is mooted and subsumed under the holding of the contests' vacation, and (2) by the terms of the remand instructions in Hickel v. TOSCO, 400 U.S. at p. 58, 91 S.Ct. 196, the old contest proceedings are only to be judicially reviewed if they are found to be presently *valid*.

6. The Court specifically holds that the old contest proceedings which invalidated the oil shale claims presently owned by TOSCO and/or ERTL have been vacated, and cannot be the basis for denying patents on those claims.

7. Further, the Court specifically holds that the Interior Department is estopped from now retroactively reversing its official position regarding the old contest decisions, and cannot now deny patents on these claims based on the old contest proceedings which voided the claims for non-performance of assessment work.

### B. C–8685 UMPLEBY v. MORTON: C–8691 NAPIER v. MORTON: C–9202 BROWN v. MORTON

1. All contest decisions voiding the oil shale claims owned by Plaintiffs, Umpleby, Napier and Brown, were va-

cated by the Interior Department in The Shale Oil Company, *supra*.

2. After these contest proceedings were vacated, the Interior Department pursued a consistent policy, evidenced by official statements, regulations, and Departmental action, of asserting that these old contest proceedings had been vacated and were of no further effect to invalidate oil shale claims or prevent their being patented.

3. This course of conduct on the part of the Interior Department was neither erroneous, unauthorized or improper, but represented the implementation of the Interior Secretary's and Department's understanding of *Krushnic* and *Virginia-Colorado, supra*.

4. Accordingly, the action of the Interior Department in denying mineral patents on the claims owned by Umpleby, Napier and Brown was erroneous; the rejection of plaintiffs' patent applications on the basis of the old assessment work contests is hereby overruled, and these cases remanded to Interior for reprocessing of Plaintiffs' patent applications.

5. In addition to the substantive error committed in denying Plaintiffs' patent applications on the basis of the old contest decisions, the processing of these applications, which culminated in the decision in Union Oil Company, 71 I.D. 169 (1964), was procedurally defective. These procedural defects, a lack of opportunity to present evidence and a violation of the doctrine of separation of functions in administrative action, are to be corrected on remand by conducting the reprocessing of these patent applications under the Administrative Procedures Act, with full due process safeguards afforded Plaintiffs.

6. Further, to prevent the piecemeal and *seriatim* disposition of these cases in a continued series of protracted appeals from Interior's rejections of Plaintiffs' patent applications on one ground after another, and to effect the mandate of the Supreme Court which directed us to consider the validity of these oil shale claims on all possible bases, this Court orders that in the reprocessing of Plaintiffs' applications, Interior is to consider and rule upon all possible obstacles to the patenting of these claims. This will include, but not be limited to, the issues of discovery, proper location, abandonment and fraud. It is hoped that if such a proceeding is held, it will be possible to finally resolve the title dispute respecting these claims with a single and final round of judicial review. Our current resource and energy situation demands nothing less.

7. The Court does not hold that Plaintiffs, Umpleby, Napier and Brown, are entitled to mineral patents on their oil shale claims, and will not enter orders directing the issuance of such patents. The Court merely holds that the denial of patents on the basis of the now-vacated contest decisions, which voided the subject claims for non-performance of assessment work, was erroneous.

8. The Court specifically holds that the Interior Department is estopped from now retroactively reversing its official position regarding the old contest decisions, and cannot now deny patents on these claims based on the old contest proceedings which voided the claims for non-performance of assessment work.

C. C-8680 TOSCO v. MORTON: C-8685 UMPLEBY v. MORTON: C-8691 NAPIER v. MORTON: C-9202 BROWN v. MORTON.

1. As to all these cases, jurisdiction is retained by this Court for the purpose of entry of such further orders and directions as may be necessary or appropriate for the construction or carrying out of the herein Order, or of any of the provisions hereof and for the enforcement of compliance herewith.

2. The Court directs that each party herein file with the Court a Status Re-

port in ninety (90) days from the date of this Order. These Status Reports shall detail the progress in the reprocessing of the Umpleby, Napier and Brown patent applications; the Interior Department action thereon; and the progress, if any, of filing of patent applications by Plaintiffs TOSCO and ERTL. It is anticipated that further Status Reports will be required, at later dates to be specified by Order of this Court, to keep the Court advised as to expeditious furtherance of the relief granted herein.

3. Within thirty (30) days of the date of this Order the parties herein shall agree upon and submit to the Court a proposed Judgment for entry herein, detailing the legal descriptions of the claims affected by this order.

This opinion contains and shall constitute the findings of fact and conclusions of law required by Rule 52, Fed.R.Civ.P.

## OIL SHALE BIBLIOGRAPHY

### ARTICLES

| | |
|---|---|
| Blair, Richard E., | "Cancellation of Oil and Gas Leases—An Administrative or Judicial Function?" 51 Georgetown L.Rev. 221 (1963). |
| Colvert, Ramon P., | "Performance of Assessment Work on Unpatented Mining Claims" 4 Natl.Res.Lwyr. 251 (1971) |
| Cooley, Frank G., | "Physical Background—Oil Shale" 59 Quarterly of Colorado School of Mines 135 (1964) |
| Delaney, Robert, | "Water for Oil Shale Development" 43 Denver L.J. 72 (1966). |
| Flora, D. H., | "Oil Shale and the Mining Laws" 27 Dicta 95 (1950) |
| Lohr, George E., | "Conclusiveness of Oil Shale Placer Mining Claim Patents" 43 Denver L.J. 24 (1966) |
| Meek, W. F., | "Records, Documents and Services of the Colorado Land Office, Bureau of Land Management" 43 Denver L.J. 83 (1966). |
| Mock, H. Byron, | "The Oil Shale Advisory Board" 43 Denver L.J. 47 (1966) |
| Morris, Percy S., | "The Middle Initial" 37 Dicta 361 (1960). |
| Nelson, William H., | "Assessment Work—Before and After the Oil Shale Case" 17 Rocky Mtn.Min.L.Inst. 435 (1972). |
| Reidy, Maurice T., | "Do Unpatented Mining Claims Exist?" 43 Denver L.J. 9 (1966). |
| Schmidt, Richard M., | "Status of Unpatented Mining Claims" 59 Quarterly Colo. School of Mines 125 (1964) |
| Schopflacher, Ernst, | "The Doctrine of Res Judicata in Administrative Law" 1942 Wisconsin L.Rev. 5 (1942). |

OIL SHALE BIBLIOGRAPHY—Continued

ARTICLES—Continued

| | |
|---|---|
| Steadman, John M., | "Forgive U. S. Its Trespasses? Land Title Disputes With the Sovereign, Present Remedies and Prospective Reform" 1972 Duke L. J. 15 (1972) |
| Comment, | "The Associated Minerals Dilemma and the New Federal Oil Shale Policy" 39 C.U.L.Rev. 370. |
| Turner, Warren, | "Problems Incident to Unpatented Mining Claims Assessment Work Requirements" 3 Rocky Mtn.Min.L.Inst. 455 (1957). |
| Note, | "Government Initiated Contests Against Mining Claims—A Continuing Conflict" 1968 Utah L.Rev. 102 (1968). |
| Note, | "Disputed Oil Shale Claims—Background and Current Conflict", 51 Minn.L.Rev. 1154 (1967). |
| Note, | "Annual Assessment Work as Notice to Prospectors", 6 Utah L.Rev. 391 (1937) |
| Note, | "Marketability and the Mining Law—The Effect of U. S. v. Coleman", 10 Arizona L. Rev. 391 (1968). |

## BOOKS

"Final Environmental Statement for the Prototype Oil Shale Leasing Program"; U. S. Department of the Interior, 1973.

"Annual Assessment Work Manual"; Don Sherwood, Editor, Rocky Mountain Mineral Law Foundation, 1972.

"Report on Economics of Environmental Protection for a Federal Oil Shale Leasing Program"; Prepared for the Director of Natural Resources of the State of Colorado, January 1971. (Governor's Oil Shale Advisory Comm.)

"Legal Study of Oil Shale on Public Lands"; Prepared by the University of Denver, College of Law, Professors Widman & Brightwell, Eds., for the Public Land Law Review Commission, Hon. Wayne Aspinall Chmn., 1969.

"Hearings Before the Committee on Interior and Insular Affairs, United States Senate, 90th Congress, 1st Session, On the Federal Oil Shale Program"; February 21, 22, 1967; September 14, 15, 1967.