UNITED STATES of America, Plaintiff,

v.

EATON SHALE COMPANY, the Heirs of Rea L. Eaton, Carol H. Eaton, Benjamin H. Eaton, Nancy Eaton Cone, Mary Eaton Porter, Gaar I. Potter, Roderick B. Potter, Patricia P. Coyne, Gertrude I. Potter, John W. Savage, Joan L. Savage, Thomas E. Prather, William C. Prather, Robert Latham, and John H. Latham, Defendants.

Civ. A. No. C.–4139.

United States District Court, D. Colorado.

May 25, 1977.

Gerald S. Fish, Dept. of Justice, Washington, D. C., Albert V. Witham, Sp. Asst. U. S. Atty., James P. Gatlin, Asst. U. S. Atty., Denver, Colo., for plaintiff.

Jay W. Tracey, Jr., Patrick M. Westfeldt, Randy L. Parcel, M. Julia Hook, Holland & Hart, Peter H. Holme, Jr., A. Edgar Benton, Holme, Roberts & Owen, Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

SHERMAN G. FINESILVER, District Judge.

The United States of America seeks to invalidate and cancel United States Land Patent No. 1131391 on the grounds that the six mining claims upon which the patent was premised did not exist at the time of the issuance of the patent. Involved are 960 acres of patented lands in Garfield County, Colorado. The patent, issued in 1951, embraced oil shale placer mining claims described as Gem Nos. 3, 4, 5, 6, 9 and 10.

Alternative grounds for relief include prayers that the present holder of the patent pay to the government the current value of the lands covered by the patent, or that a constructive trust be imposed on monies received by the original patentee. The government also raises a constructive trust theory with regard to title to the patented land.

Defendant Eaton Shale Company (Eaton) is the current owner of the mineral interest in the lands. Eaton acquired ownership of the patent in 1953. It claims issuance of a valid patent to the original patentee and marketable title in its predecessors in title.

For the reasons outlined below, we hold that the patent in question is valid.

## I

### FACTUAL AND LEGAL BACKGROUND TO THIS ACTION

#### A. CONTENTIONS OF THE PARTIES

The government filed this suit on July 11, 1972, to invalidate Patent No. 1131391, which had been issued on March 19, 1951, to patentee Delos D. Potter (deceased). The government has named a number of individuals, as well as Eaton, as defendants herein. Some of the individual defendants are (a) heirs of Potter, or heirs of Rea L. Eaton, who once owned an interest in the lands, and (b) owners of oil and gas royalties and surface rights.

The government seeks to have the patent declared void as to oil shale placer claims Gem Nos. 3, 4, 5, 6, 9 and 10, and to have those claims reconveyed to it either directly or by way of a constructive trust. In the alternative, the government seeks to impress a monetary trust upon the estate of Potter, and successor estates of his heirs, and to have the defendants declared jointly and severally liable for the current value of

**1260**

those lands. At trial, the court dismissed the action as it relates to the estates of Potter and of his heirs. The estates of Rea L. Eaton and of his heirs, and the surface owners were also dismissed from this case.

The government's claim of invalidity is based, in part, upon a contest decision dated December 9, 1931, by the Commissioner of the General Land Office (the predecessor agency of the Bureau of Land Management), in which the Commissioner purported to have declared oil shale placer claims Gem Nos. 1 through 10, inclusive, null and void (Contest No. 12013). The remainder of the government's case relies upon an unrecorded quit claim deed, dated January 12, 1929, from DeBeque Shale Oil Company (DeBeque) to the United States of America. The deed is located in the file for the Contest proceeding. It is unrefuted that the deed was never recorded in the real estate records in Garfield County, Colorado. The government contends that the deed conveyed Gem Nos. 3, 4, 5, 6, 9 and 10 to the United States.

The government further contends that in issuing the patent to the Gem claims, officials of the Department of Interior acted without authority (Tr. 347). In its concluding oral argument, the government argued, "There is . . . very substantial concern of the United States in this case which admittedly arises because federal employees for reasons which we cannot fully establish at this time failed to perform the duties they were required to do by law. They ignored facts of critical legal significance and issued a patent in total disregard of those facts." (Tr. 353–354).

Thus, the government maintains that a void patent was issued by mistake, as the issuance was beyond the jurisdictional authority of the issuing official; further, plaintiff argues that the patent is void for having been issued without legal authority, and is, therefore, subject to cancellation.

## B. THE HISTORY OF EATON'S ACQUISITION OF THE PATENT

1. The real property in question came under government ownership in 1848 by virtue of the Treaty of Guadalupe Hidalgo between the United States and Mexico (9 Stat. 922).

2. In 1872, Congress adopted the General Mining Laws which, as amended from time to time since 1872, provide in 30 U.S.C. § 21, *et seq.* for the unhindered exploration and occupation of valuable mineral deposits in land belonging to the United States and, at the claimant's option, for acquisition by patent of such deposits and the lands in which they are found.

3. (a) Thereafter and until enactment of the Mineral Leasing Act on February 25, 1920, oil shale deposits found in these public domain lands were subject to entry and appropriation through the location of placer mining claims under the Placer-Claim Provisions of the General Mining Laws.[1]

(b) The Mineral Leasing Act withdrew oil shale from the operation of the mining laws and made it subject to government leasing. However, the Act did not impair the effectiveness and validity of oil shale placer mining claims in existence on February 25, 1920, and thereafter maintained in compliance with the laws under which they were initiated. 41 Stat. 451 (1920), 30 U.S.C. § 193 (1964).

4. Pursuant to the mining laws, on January 16, 1918 the Gem Claims were located by Joseph Bellis and seven other individuals as oil shale placer mining claims.

5. In 1919, by mesne conveyances, DeBeque acquired all of the Gem Claims, including those involved in this suit, i. e., Gem Nos. 3, 4, 5, 6, 9 and 10.

6. The quit claim deed executed by DeBeque on January 12, 1929, purportedly conveyed the six claims in question to the government.

7. (a) In 1929, Louis C. Mackel, Assistant Mining Engineer, General Land Office

---

1. Rev.Stat. §§ 2329–2331, as amended by the Act of March 3, 1891, 26 Stat. 1097 (now 30 U.S.C. §§ 35–36) and supplemented by the Petroleum and Mineral Oils Act of February 11, 1897, 29 Stat. 526 (formerly 30 U.S.C. § 101).

of Interior, was engaged in examining oil shale placer mining claims. He had the responsibility of preparing reports containing the results of his examinations and including recommendations for departmental action to contest the claims.

(b) On January 10, 1929, J. L. Hurt, who was then President of DeBeque wrote a note to Mackel stating:

"Dear Sir: Enclosed please find quit claim deed as per your request."

The note is in Field Division File No. 44881–2, and was in that file when it was obtained from the Federal Records Center, Denver, Colorado, in late 1973. The handwritten note was on a fragment of a letter or memorandum containing the signature of W. W. Platt, then secretary of DeBeque. The letter of transmittal is dated two days before the date of execution and acknowledgment of the deed.

(c) Mackel wrote a mineral report, dated January 23, 1929, containing the results of his investigation of the Gem Claims in question.

(d) The quit claim deed attached to Mackel's mineral report was transmitted to the Commissioner of the General Land Office, Washington, D. C., with a memorandum of January 26, 1929, from Ralph D. Kelley, Chief of Field Division, General Land Office (GLO). Mackel's report refers to the deed as follows:

"In this year the (DeBeque) Company abandoned Gem Nos 3–4–5–6–9–10. Attached hereto is a quit claim deed wherein the Company transferred their interest in these claims to the United States."

(e) Kelley approved and transmitted Mackel's report to the Commissioner of the General Land Office. He stated that "Engineer Mackel has obtained a quit claim deed from the owners, conveying to the United States Gem Nos. 3, 4, 5, 6, 9 and 10," and recommended "that the deed of reconveyance be accepted and recorded."

(f) The claims contest was instituted in 1929. The 1929 quit claim deed is contained in the Contest File. The sole basis of the contest, however, was that the claimant had failed to perform assessment work on each of the Gem Nos. 1–10 in furtherance of the claim, as required by the Mineral Leasing Act. On September 1, 1972, the Mackel report, Kelley's memorandum, and the unrecorded quit claim deed were physically situated and paginated in proper form in BLM files.

8. The quit claim deed was never formally accepted by the government or its agents, and was not recorded in the appropriate County records, as provided by the Colorado land recording laws. During the relevant period, the deed remained unrecorded, and did not appear in the abstract of title submitted by the patent applicant in 1949. However, the physical existence and location of the quit claim deed were known to, and considered by, the Bureau's adjudicators and attorneys who approved the claims for patent.[2] It is clear that the patent was issued by Interior on March 19, 1951, with complete factual knowledge regarding the quit claim deed. Interior did not consider the unrecorded Gem quit claim deed as evidence of an intention of Eaton's predecessor in title to abandon the claim. No action was taken by Interior in regard to the quit claim deed, even though Interior's records, in several areas, made mention of the deed, and Interior's files were themselves the repository of the unrecorded deed.

9. On May 15, 1929, the Notice of Contest Charges, designated 12013, was mailed by the United States to DeBeque.

10. An answer was filed by DeBeque, as contestee, on June 17, 1929, stating that the Company owned Gem Nos. 1, 2, 7 and 8. No reference was made to Gem Nos. 3–6, 9 and 10.

11. No hearing was ever held, nor were any findings ever made by the General Land Office, with respect to the 1929 charges. On December 9, 1931, the Com-

---

2. See page 5 of mineral report of Walter H. Koch, dated January 17, 1950, notation by Mr. Earl Duckworth on the margin; and see memorandum of January 30, 1951, approving the claim for patent.

missioner of the General Land Office held that the charges and proceedings under that Notice were ineffective.

12. On October 20, 1931, the Register of the General Land Office sent a letter to the Commissioner stating that a Field Division letter of July 3, 1931, had directed adverse proceedings against Gem Nos. 3–6, 9 and 10, and that notices of adverse charges had been issued on July 1, 1931. The Contest File does not contain copies of such "notices of adverse charges" addressed to DeBeque. The Register's letter further stated that registry receipts were included and that no answer had been filed denying the charges.

13. At all times while contest No. 12013 was in progress, a procedural manual of Interior provided, in part, as follows:

6. Notice of the charges may in all cases be served personally upon the proper party by any officer or person or by registered letter mailed to the last address of the party to be notified, as shown by the record, and to the post office nearest the land.

44 L.D. 579 (1919), Circular No. 460

14. The contest file contains no receipts or other evidence that notices of charges in any contest against Gem Nos. 3–6, 9 and 10 were mailed to the post office nearest the lands covered by those mining claims. No reference to Contest No. 12013 has ever been recorded in the records of Garfield County, Colorado, the county in which the Gem claims are located.

15. A draft of a second purported Notice of Charges to contest the Gem Claims is dated July 31, 1931, and is found in the Contest File at BLM 023. No notice of charges in final form is included in the Contest File, nor is there a reasonable and fair designation of the mining claims involved. The purported second notice contains no address, is not signed, and does not follow GLO Procedure No. 460, dealing with the manner of proceeding in contest actions.

16. The Contest File fails to reflect that the government effectuated proper service and notification of the charges against Gem Nos. 3, 4, 5, 6, 9, and 10 in the 1931 contest proceedings. There is no evidence that cop-

ies of the Notice of Charges were received by officers of DeBeque. The only indication that any type of service might have been attempted is a hand written notation, by a non-identifiable person, on the draft letter: "Notice mailed July 3, 1931." What is apparently a copy of a third purported notice, dated August 5, 1931, alleges that DeBeque had not performed the required assessment work on Gem Nos. 1, 2, 7 and 8 (these claims are *not* involved in this lawsuit). No references dealing with this supplemental contest appear in the land records of Garfield County, Colorado.

17. In 1935, DeBeque conveyed its interest in the Gem Claims for a valuable consideration to Joseph Bellis through mesne conveyances. Delos D. Potter acquired the claims in 1948.

18. On July 12, 1949, Potter filed an application for the patent to the Gem Claims with the Colorado State Office of the Bureau of Land Management. During the following two year period, officials of the Department of Interior in Denver and Salt Lake City, reviewed the patent application. Finally, the patent application was approved in Washington, D. C.

19. On March 19, 1951, the United States issued Patent No. 1131391 covering the Gem Claims, including Gem Nos. 3, 4, 5, 6, 9 and 10. On that date, the six year statute of limitation provided by 43 U.S.C. § 1166 commenced running. The patent was issued pursuant to statutory jurisdiction, and within the power and authority of the Director of the BLM. It was valid in every particular.

20. The patent record clearly reflects that the Gem Claims were patented in 1951 with full knowledge by government adjudicators of the unrecorded quit claim deed and of the 1931 GLO decision holding the claims null and void. Contest File No. 12013 has a notation dated January 22, 1951 which reads: "See M.E. Colo 050–55 I.D. 287." The BLM Director received the patent file on December 1, 1949. The patent file contains a reference to "Miscellaneous File No. 1327537". The Contest File also

contains this note: "Deed in 1327537 'Not accepted, Not recorded'." It is apparent that the 1931 GLO decision was not considered to be an impediment to issuance of the patent to the Gem Claims. The patent record clearly establishes that the ten Gem Claims were patented in 1951 with full knowledge and consideration by Interior officials that six of these claims had purportedly been relinquished to the government by virtue of the 1929 quit claim deed, and that the claims had been declared null and void in 1931 by virtue of the government's contention that assessment work had not been performed.

21. On April 20, 1953, Potter conveyed his interest in Gem Claims 1–10, excepting and excluding the surface areas, to Eaton Shale Company by warranty deed for valuable consideration.

## C. COURT AND ADMINISTRATIVE PROCEEDINGS.

### 1. 1930–1962

Two significant Supreme Court cases were decided in 1930 and 1935. *Wilbur v. Krushnic*, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930) held that the United States government could not challenge the validity of oil shale placer mining claims on the basis of failure to perform annual assessment work. In *Krushnic*, however, the claimant had resumed assessment work before the government contest was instituted, and the Court's ruling left uncertain whether this fact of resumption of work was essential to the result. Interior took the position that it was, and continued to contest oil shale placer mining claims upon which annual assessment work had not been performed, where such had not been resumed prior to initiation of the contest.

This uncertainty in the law as well as the questionable policy of Interior, were re-solved in *Ickes v. Virginia-Colorado Development Corp.* 295 U.S. 639, 55 S.Ct. 888, 79 L.Ed. 1627 (1935). The Supreme Court held that the government could not challenge oil shale placer mining claims based on failure to perform assessment work, regardless of whether assessment work had been resumed prior to the time of initiation of a contest.

As a result of *Krushnic* and *Virginia-Colorado*, numerous oil shale claims that had been invalidated by earlier contest proceedings became viable once again. *See The Shale Oil Company*, 55 Int.Dec. 287 (1935), which held that Department decisions in conflict with *Virginia-Colorado* were overruled, without authority of law, and void. *Virginia-Colorado* involved only two contest proceedings. However, until 1962, the Department issued patents on many oil shale claims without acting to vacate adverse decisions in the earlier contest proceedings. Numerous oil shale patents were issued in spite of the fact that Interior's records clearly indicated that the claims had been declared null and void in prior contests.[3]

Decisions and adjudications in Interior until the 60's clearly indicate that *The Shale Oil Company* case was unequivocally considered to have reversed and set aside all prior adverse contest proceedings based on the failure to perform assessment work. During this period, the GLO and BLM disregarded all such earlier contest decisions in processing and adjudicating applications for patents. *See, Udall v. Oil Shale Corp.*, 406 F.2d 759 (10th Cir. 1969); on appeal designated, *Hickel v. The Oil Shale Corp.*, 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970). Also *see Union Oil Company of California*, 71 I.D. 169 (1964); Lohr, *Conclusiveness of United States Oil Shale Placer Mining Claim Patents*, 46 Denver L.J. 24, 37 (1966); Schmidt, *Status of Unpatented Claims*, Quarterly of the Colorado School of Mines, pp. 125–126 (July 1964).

3. Oil Shale, Patents issued during the years 1951 to 1961 are as follows:

| | Patented Oil Shale Claims | Acreage |
|---|---|---|
| 1951 | 15 | 13,155 |
| 1952 | 1 | 2,394 |
| 1953 | 7 | 4,809 |
| 1954 | 9 | 7,385 |
| 1955 | 22 | 36,826 |
| 1956 | 5 | 1,756 |
| 1957 | 5 | 7,825 |
| 1958 | 14 | 5,554 |
| 1959 | 10 | 7,445 |
| 1960 | 3 | 2,030 |
| 1961 | 3 | 5,446 |

(Exhibit Attachment IQ)

**2. 1962–1977**

(a) A number of cases arose in the federal courts after the Interior Department changed its policy with respect to the validity of oil shale claims that had been the subject of unappealed contest proceedings. The Solicitor's opinion in *Union Oil Co. of Calif., supra,* approved the position of the Land Office Manager, BLM, Denver, Colorado, that claims declared invalid in 1930–1933 contests based on failure to perform annual assessment work were invalid, and that these early decisions of invalidity could not now be challenged. He held that principles of administrative finality, estoppel by adjudication, and *res judicata* prevented challenge of the old contest proceedings, unless the claimants or their predecessors had not been afforded proper notice of the hearings. On this basis, numerous pending patent applications were rejected by the BLM. *Gabbs Exploration Co. v. Udall,* 114 U.S.App.D.C. 291, 315 F.2d 37, *cert. denied,* 375 U.S. 822, 84 S.Ct. 61, 11 L.Ed.2d 56 (1963) held that these early contest proceedings should not be reviewed in the absence of a jurisdictional defect, where the claimants or their predecessors did not seek immediate review of adverse decisions.

(b) *The Oil Shale Corp. v. Udall,* 261 F.Supp. 954 (D.Colo.1966) [TOSCO] filed in 1964, rejected the Interior Department's new theory. Judge William E. Doyle reasoned that the *Krushnic* and *Virginia-Colorado* decisions held that the Department had acted without jurisdiction in the earlier contest proceedings, and that these unappealed proceedings are not *res judicata.* The Tenth Circuit affirmed *TOSCO* in 406 F.2d 759 (1969). However, the Supreme Court reversed the lower courts on the ground that the holdings of *Krushnic* and *Virginia-Colorado* must be confined to cases of substantial compliance with the annual assessment requirement. *Hickel v. The Oil Shale Corp.,* 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970). The Supreme Court remanded the case for the District Court to

determine whether the Interior Department could change its policy retroactively, whether the old contest proceedings are open to direct judicial review, and whether there had been substantial compliance with the assessment requirement.

On remand, the District Court held that the Government is estopped from denying patents based on the 1930's contest proceedings. *TOSCO v. Morton,* 370 F.Supp. 108 (D.Colo.1973). We ordered that the patent applications be reprocessed by the Interior Department. On appeal for the second time, the Tenth Circuit retained jurisdiction, but directed that administrative proceedings be conducted on the patent applications. The Supreme Court denied certiorari on June 21, 1976, 426 U.S. 949, 96 S.Ct. 3169, 49 L.Ed.2d 1185. On January 17, 1977, we remanded the consolidated cases in *TOSCO* to the Interior Department for patent proceedings.[4]

(c) The situation in *TOSCO* is distinguishable from that in *Pacific Oil Co. v. Udall,* 273 F.Supp. 203 (D.Colo.1967). In the latter case Judge Doyle upheld the Government's *res judicata* theory. Plaintiff's predecessor in interest had been absent without good cause from a 1933 contest proceeding, default was entered against him, and he subsequently executed a quit claim deed. In *TOSCO,* Judge Doyle had held that the Secretary had acted outside the scope of his authority when he cancelled claims for failure to perform annual assessment work.

(d) On a related issue, the Interior Department decided that oil shale claims are invalid on the ground that they did not constitute discoveries of a valuable mineral deposit pursuant to 30 U.S.C. § 22, *et seq. United States v. Frank W. Winegar,* 81 I.D. 370 (June 28, 1974). In *Shell Oil Co. v. Kleppe,* 426 F.Supp. 894 (D.Colo.1977), we reversed this decision on several grounds, including that of estoppel.

(e) On November 1, 1976, after extensive discovery and trial preparation, a settle-

---

4. *Amerada Hess Corp. v. Morton,* Civ.Action No. C–4361 (D.Colo.1972), (Complaint) involved claims nearly identical to those of the

plaintiffs in *TOSCO.* On February 17, 1977, we remanded that case to the Interior Department.

ment was reached in another oil shale case in this district, viz., *United States v. Mobil Oil & Equity Oil Co.*, Civil Action No. C–4135. · In that case, as here, the government argued that patents allegedly issued by mistake in the 1950's are now either void or voidable.

## D. LEGAL AND MINING PUBLICATIONS

The Interior Department's reversal of its position with regard to unappealed contest proceedings and its meandering treatment of oil shale claims in the patenting process spawned numerous articles in legal and mining publications. *See Miller, Impediments to Public Domain Oil Shale Development*, 35 Colo.L.Rev. 170–190 (1963), which presents a concise overview of title problems and history of Interior policy.

At the First Annual Symposium in Oil Shale at the Colorado School of Mines (April 30–May 1, 1964), Richard Schmidt, Esq. presented a paper on the "Status of Unpatented Claims." *Mobil*, Ex. 124. He noted that even oil shale patents may be jeopardized by the Department's new policy. Several articles on the problem of oil shale claims appeared in *The Denver Post* (August 30–September 6, 1964). *Mobil*, Ex. 126. In 1966–67, J. R. Freeman, editor of the *Farmer and Miner*, a newspaper in Frederick, Colorado, wrote a 51-part series entitled "The Multi-Billion Dollar Grab of Oil Shale Lands." *Mobil* Ex. 130–135. He suggested that patents that were erroneously issued by the Government are not valid.

An "Oil Shale Symposium," 43 Denver L.J. 1–89 (1966) included an article by George Lohr, Esq. on the "Conclusiveness of United States Oil Shale Placer Mining Claim Patents." *Id.* at 24–46. He remarked that the mistaken issuance of an oil shale patent provided a weak basis for recovery by the Government. *Id.* at 38. He noted that *Union Oil Co., supra,* could be used to argue that where the department

has failed to challenge a patent for a number of years, the issuance of the patent is *res judicata. Id.* at 38 n. 121.

*Res judicata,* administrative finality, and abandonment of claims are discussed in *Disputed Oil Shale Claims: Background and Current Conflict,* 51 Minn.L.R. 1154 (1967).

Finally, in April 1969, the University of Denver College of Law prepared a "Legal Study of Oil Shale on Public Lands" for the Public Land Law Review Commission. *Mobil,* Ex. 139. This study suggests that suits to cancel patents issued after an adverse claim determination are barred by the statute of limitations. *Id.* at 233.

## E. GOVERNMENT RECOGNITION OF THE PATENT PROBLEM

Since the mid-1950's, the government has recognized the problem of invalidating patents in oil shale land that were mistakenly issued. Despite discussion of this issue at the highest levels of government, this suit was not filed until 1972. In addition, as we have noted, significant court cases and legal publications, *supra,* called attention to problems with the uncertain government policy toward oil shale claims and patents.

On August 26, 1956, the Solicitor of the Interior recommended to the Department of Justice that action be instituted to cancel another patent issued to Eaton Shale. *Mobil,* Ex. 152.[5] On August 5, 1957, a Complaint was filed in that case (unrelated to the instant action) on the ground that the underlying claim had been declared null and void. *Mobil,* Ex. 156. Other suits were initiated by the government in the 1950's on the same ground. *Mobil,* Ex. 151, 157–168.

Between 1958 and 1961, the Associate Solicitor of the Interior began to advise dismissal of pending patent applications based on unappealed adverse contest proceedings. *Mobil* Ex. 179–182. On June 26, 1963, the Director of the BLM described the Department's change of position since 1958, and raised the problem of discovery. *Mobil,*

---

**5.** Exhibits marked for identification in *United States v. Mobil Oil and Equity Oil Co.*, Civil Action No. C–4135 (D.Colo.), by Stipulation,

have been admitted as evidence in this case. They are designated as "*Mobil*, Ex. ___."

Ex. 194. Following the Solicitor's decision in *Union Oil Co., supra,* Senator Peter Dominick of Colorado noted that its rationale should be equally applicable to patents that have already been issued. *Mobil,* Ex. 197. On May 5, 1964, Senator Gordon Allott of Colorado, along with Senators Dominick, Bennett (Utah), and Simpson (Wyoming), introduced S.B. 2809, which would have overruled *Union Oil Co.*

During the early 1960's, government officials in policy making positions were involved in detailed inquiry into crucial aspects of patenting of oil shale claims. These discussions involved the Director of the Bureau of the Budget, the Assistant Special Counsel to the President, Secretary of the Interior Stewart Udall, and Solicitor of the Interior Frank Barry. Areas of concern included (1) the effect of cases pending in the Department and in the courts, where earlier claims had been declared null and void but patents still issued; (2) authority for cancelling prior issuance of patents on such claims; (3) whether the United States could bring suit against patentees or their successors to recover the value of lands erroneously patented, even though suit would be initiated when attack on the patent itself would be barred by the six year statute of limitation; (4) whether a constructive trust could be imposed on lands covered by patents allegedly issued by mistake; and (5) whether patents could be attacked on the ground that prior departmental decisions declared claims null and void solely on charges of failure to do assessment work.

The government, then, has long recognized the problems of challenging mistakenly issued patents that are more than six years old. That the six year statute of limitation was a bar to suit was clearly recognized in government correspondence, and in statements of executive officials of the Interior Department. In October 1966, the government noted the problem of recovering patents issued between 1947 and 1955 on "6 claims that were no longer in existence inasmuch as they had been relinquished to the United States some 21 years previously." Brief for the United States,

Appendix F., p. 12. On May 27, 1964, Secretary of Interior Udall informed Congressman Wayne Aspinall (Colo.), Chairman of the House Committee on Interior and Insular Affairs, that patents issued more than six years prior to 1964 were protected by the statute of limitation, unless obtained by fraud. *Mobil,* Ex. 202. More than three years later, Solictor Barry wrote a letter in which the statute of limitation barrier was noted. However, he also remarked that the Department had been working on a constructive trust argument for recovery of patents filed more than six years earlier. *Mobil,* Ex. 212. On April 17, 1968, Secretary Udall told Senator Inouye (Hawaii) that a small number of patents issued in the 1950's may be recoverable by the government.

The editorials by J. R. Freeman, *supra,* elicited a number of responses from high government officials with regard to the problem of mistakenly issued patents. On June 27, 1966, Undersecretary of Interior John Carver wrote that in the absence of fraud, there was no legal basis to withdraw patents that were more than six years old. *Mobil,* Ex. 206. Five months later, Solicitor Barry wrote, "Time, in the form of the statute of limitation has made all such patents unassailable." *Mobil,* Ex. 208.

High level policy-making officials of Interior, Justice, Bureau of the Budget, and the Office of the President had full information that patents had been issued through 1961 under practices which the government later considered erroneous. These officials had the ready knowledge and ability to locate patents that had been erroneously issued. Indeed, in the instant action, Mr. Robert Bennett, an employee in the Denver office of the BLM, testified at trial that he observed the unrecorded quit claim deed in the patent and land files of Interior between June 20, 1966, and July 1, 1966. The existence of that deed triggered consideration by the BLM to attempt to cancel the patent. However, suit was not filed until 1972, twenty-one years after the patent in question had been issued with full knowledge by the government of all the currently asserted impediments to its validity.

## II

## PATENT

"A patent to land, issued by the United States under authority of law, is the highest evidence of title, something upon which its holder can rely for peace and security in his possession. It is conclusive evidence of title against the United States and all the world, until cancelled or modified by an action brought for this purpose." 2 *The American Law of Mining*, § 1.29 at 357.

The patent in question is regular on its face, and carries with its issuance (1) the fact that no adverse claim exists, (2) a description of the character of the land embodied in the patent, and (3) conclusive evidence that a discovery within boundaries set forth in the patent has been made according to law.

█ The issuance of the patent creates a presumption that all requisite steps and requirements of law and departmental regulations have been fully complied with. *Wright-Blodgett Co. v. United States*, 236 U.S. 397, 35 S.Ct. 339, 59 L.Ed. 637 (1915).

A leading treatise states:

. . . a patent which is regular in form and for whose issuance there is statutory authority is so binding on the government that a purchaser from the patentee need make no investigation as to the details of its issuance—the legal title has passed and the patent is conclusive against the government. The General Land Office loses its jurisdiction over the land as soon as a valid patent is issued. 2 *Patton on Land Title*, § 292, pages 26, 27.

## III

## BONA FIDE PURCHASER

█ A bona fide purchaser is one who "acquired his interest in good faith, for valuable consideration, and without notice of the violation of the departmental regulations." *Southwestern Petroleum v. Udall*, 361 F.2d 650, 656 (10th Cir. 1966). Contrary to the government's position, we find that Eaton is a bona fide purchaser for value; further, Eaton had neither actual nor constructive notice of any latent defect in its fee simple title. Eaton paid a valuable consideration ($850,000) for the patent (this sum includes interest in other lands), and has expended substantial sums to improve, maintain, and use the grounds covered by the patent.

█ At the time Eaton acquired its interest in the patent, it acted in good faith and caused an appropriate and prudent title examination of these lands to be made by Mr. John P. Akolt, who rendered a written title opinion. Eaton was on constructive notice of matters of record in the office of the Clerk and Recorder of Garfield County, Colorado; but neither the 1929 quit claim deed nor notice of the 1931 contest proceedings were in such records when Mr. Akolt examined the grantor's title. We have considered the testimony of several Colorado attorneys who have had experience in mining law and title examination. We find that Mr. Akolt's title examination was in conformity with professional standards prevailing in Colorado at that time. Moreover, it did not give Eaton any notice, constructive or otherwise, of the contest proceedings or the quit claim deed. We note that his title opinion was timely filed with the Department of Interior as a requisite to issuance of patent No. 1131391. Thus, prior to patent issuance, government examiners had full opportunity to review the title opinion. We find that Mr. Akolt did not have any duty to personally check records in Interior to ascertain if instruments of note were situated therein.

We reject the government's contention that defendant Eaton is not a bona fide purchaser on the ground that BLM index and reference material in the Denver, Salt Lake City, and Washington, D. C. Land Offices constituted constructive notice of the 1931 contest proceedings and the 1929 unrecorded quit claim deed.

No federal or state statute creates constructive notice of such records. Moreover, the evidence reflects that even an experienced title examiner, who is familiar with

nuances of mining claims and patents, would be hard put to locate references to the contest proceedings or to view the instruments themselves. An ordinarily prudent man would not be on notice of the existence of these instruments. *Southwestern Petroleum, supra.*

■ We note that even if Eaton had actual notice of the 1931 contest proceedings, (and we find that it did not), it would have been entitled to rely on Interior's policy of ignoring old contest decisions, and would still be in the posture of a bona fide purchaser.

■ Because Eaton has clearly established the fact that it was a bona fide purchaser, the patent would be unassailable even if it were originally acquired by fraud (not the case here). *Colorado Coal and Iron Co. v. United States,* 123 U.S. 307, 8 S.Ct. 131, 31 L.Ed. 182 (1887). No action by the government lies against bona fide purchasers of a patent. *United States v. Koleno,* 226 F. 180 (8th Cir. 1915). The title of a bona fide purchaser of patented lands is superior to the equitable claim of the government to void the patent and the underlying title for fraud or mistake in its issuance. *United States v. Detroit,* 200 U.S. 321, 26 S.Ct. 282, 50 L.Ed. 499 (1906). See Parts IV and V, *infra.*

## IV.

### THE STATUTE OF LIMITATION

■ Eaton principally contends that this action is barred by the six-year statute of limitation of 43 U.S.C. § 1166.[6] We agree.

Under the provisions of the statute (first enacted in 1891), suits by the United States to vacate and annul any patent shall be

brought within six years after the date of issuance of such patent. The statute protects a patent whether or not the executive agency had authority to issue it. *United States v. Chandler-Dunbar Water Power Co.,* 209 U.S. 447, 450, 28 S.Ct. 579, 52 L.Ed. 881 (1908).

It is the purpose of the statute to render patents to real property and interests therein more secure and marketable.[7] The statute extinguishes any right the government may have in the land, and vests a perfect title in the adverse holder after six years from the date of the patent. *Burke v. So. Pac. R. Co.,* 234 U.S. 669, 34 S.Ct. 907, 58 L.Ed. 1527 (1914); *Chandler-Dunbar, supra; United States v. Winona Co.,* 165 U.S. 463, 476, 17 S.Ct. 368, 41 L.Ed. 789 (1897); *United States v. American Lumber Co.,* 85 F. 827 (9th Cir. 1898); *United States v. Smith,* 181 F. 545, 554 (D.Or.1910). The statute renders titles derived from six year old patents absolute and free from technical or other administrative defects (a) in order that subsequent patentees, transferees, and encumbrancers may rely on the record title; (b) so that the record title of the party in possession shall be sustained and perfected, and (c) for the protection of patentees and their transferees against challenges to their titles.

In the instant case, the statute commenced running at the time the patent was issued in 1951. The patent therefore, has long been immune from attack on the ground that the mining claims giving rise to the patent were originally invalidated by contest proceedings in 1931.

In *Chandler-Dunbar, supra,* it was claimed that the patent instrument had been erroneously issued, because the United States had previously reserved the land, and consequently the government argued

6. We note that the Colorado statute of limitation, C.R.S. 38–41–111 (1973), is to the same purpose and effect, and strengthens our interpretation of the federal statute herein.

7. In addition to this special function of 43 U.S.C. § 1166, the function of a statute of limitation has recently been articulated in *Meyer v. Frank,* 550 F.2d 726, 730 (2d Cir. 1977):

The policy of repose behind the statute of limitations protects defendants 'by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared' . . . It also protects the courts by relieving the burden of trying stale claims when a plaintiff has slept on his rights.

that the patent was void. The court held to the contrary:

> But the statute presupposes an instrument that might be declared void. When it refers to 'any patent heretofore issued,' it describes the purport and source of the document, not its legal effect. If the act were confined to valid patents it would be almost or quite without use . . .
>
> In form the statute only bars suits to annul the patent. But statutes of limitation, with regard to land, at least, which cannot escape from the jurisdiction, generally are held to affect the right, even if in terms only directed against the remedy. . . . This statute must be taken to mean that the patent is to be held good and is to have the same effect against the United States that it would have had if it had been valid, in the first place.

*Id.* 209 U.S. at 450, 28 S.Ct. at 580.

The holding in *Chandler-Dunbar* with respect to the validity of mistakenly issued patents was re-affirmed in *Louisiana v. Garfield,* 211 U.S. 70, 77, 29 S.Ct. 31, 53 L.Ed. 92 (1908) (Justice Holmes). *United States v. Whited & Wheless,* 246 U.S. 552, 563, 38 S.Ct. 367, 368, 62 L.Ed. 879 (1918) limited the holding of *Chandler-Dunbar,* at least in cases of fraudulent-obtained patents, to suits attacking the patents themselves.

> The support for the contention of the defendants . . . which they claim to find in *United States v. Chandler-Dunbar Water Power Co.,* 209 U.S. 447, 28 S.Ct. 579, 52 L.Ed. 881, is based upon the statement that by the statute the patent is 'to have the same effect against the United States that it would have had if it had been valid in the first place.' But that is merely an emphatic way of saying that the title is made good. It does not import that the collateral effects of fraud in obtaining the patent are purged. The element of bad faith or fraud was expressly excluded.

*Accord, Lee Wilson & Co. v. United States,* 245 U.S. 24, 32, 38 S.Ct. 21, 62 L.Ed. 128 (1917); *United States v. St. Paul Co.,* 247 U.S. 310, 314, 38 S.Ct. 525, 62 L.Ed. 1130

(1918); *Huntington v. Donovan,* 183 Cal. 746, 192 P. 543, 546 (1920). While the patent itself may not be attacked, these cases held that the government may recover from the wrongdoer the value of land to which a patent had been fraudulently obtained.

A few years later, the Supreme Court held that a suit by the United States to recover the value of land, title to which had been fraudulently obtained, is barred by a prior dismissal for failure to meet the statute of limitation of a suit to cancel the patent. *United States v. Oregon Lumber Co.,* 260 U.S. 290, 43 S.Ct. 100, 67 L.Ed. 261 (1922):

> The defense of the statute of limitations is not a technical defense but substantial and meritorious . . . Such statutes are not only statutes of repose, but they supply the place of evidence lost or impaired by lapse of time by raising a presumption which renders proof unnecessary . . . ' . . . An important public policy lies at their foundation. They stimulate to activity and punish negligence. . . . Mere delay, extending to the limit prescribed, is itself a conclusive bar.'

*Id.* at 299–300, 43 S.Ct. at 102–103.

The decisions of the Supreme Court uniformly hold that the statute of limitation fixes the time within which the United States may institute proceedings to vacate and annul a patent issued by mistake or as a result of fraud. The running of the period prescribed in the statute makes the title of the patentee good as against the grantor, the United States.

Government suits to cancel patents require diligence on the part of the United States. *United States v. Diamond Coal Co.,* 255 U.S. 323, 41 S.Ct. 335, 65 L.Ed. 660 (1921); *United States v. Puget Sound Traction, Light & Power Co.,* 215 F. 486 (W.D.Wash.1914). In *Diamond Coal Co.,* the government sought to cancel fraudulently obtained patents 14 to 20 years after their issuance. The court held that the government may be barred from bringing such a suit by the operation of the equitable principle of laches. *Id.* 255 U.S. at 334, 41

S.Ct. 335. The government must be shown to have had a reasonable opportunity to discover the fraud in order to invoke the doctrine of laches. *Id.* 255 U.S. 334–335, 41 S.Ct. 335. In like manner, the statute of limitation does not begin to run until discovery of the fraud. *Exploration Co. v. United States,* 247 U.S. 435, 447, 38 S.Ct. 571, 62 L.Ed. 1200 (1918).

■ Where the patent was allegedly obtained by fraud, the Tenth Circuit Court of Appeals has held that the statute of limitation commences at the time of issuance, if the department was in possession of the means for obtaining knowledge of the concealed fraud or if the concealed matter was of public record in the county where the land was located. *United States v. Christopher,* 71 F.2d 764 (10th Cir. 1934). Moreover, even assuming that the statute of limitation is no bar, a fraudulently obtained patent cannot be attacked in the hands of a bona fide purchaser. *Colorado Coal & Iron Co. v. United States,* 123 U.S. 307, 313, 8 S.Ct. 131, 31 L.Ed. 182 (1887).

■ If the statute of limitation serves to insulate a patentee (or transferees) from government action to vacate the patent on an allegation of fraud, a stronger case is established to prevent annulment on the basis of mistake or lack of authority in issuing officials. *See Chandler-Dunbar, supra.* In the instant case, fraud has neither been alleged nor proven. The patentee did not act improperly in any respect, nor did he withhold any information relevant to the issuance of the patent.

All information that potentially would hint at mistake or employee error was available to the government both at the time of the patent application and during the investigation prior to patent issuance. Indeed, the government had in its own custody information dealing with legal compliance with requisites for entitlement to the patent (the 1931 contest proceedings and the unrecorded deed). The government considered these items, and still issued the patent. No viable defense exists in favor of the government to prevent full operation of the six-year statute of limitation. The government failed to exercise due diligence in ascertaining relevant facts prior to the issuance of the patent and for twenty-one years thereafter. *See United States v. Bellingham Bay Improvement Co.,* 6 F.2d 102 (9th Cir. 1925).

> In courts of justice, facts must be proved in the same manner and by the same means, no matter who the litigants may be. The government is not privileged merely to lay its claim before such a tribunal, and demand allowance forthwith. Speaking generally, it must offer the same evidence as an individual, both in quantity and quality; and if it offers none, or if the evidence be insufficient, it fails precisely as the individual fails in similar circumstances. The property of a citizen can only be taken according to the rules and forms of law, and even if it offers none, or if the sovereign who is striving to take it by an action of court, we think the sovereign also should be required to prove his right, and to prove it with the same strictness and according to the same rules as prevail in other cases.

*Chesapeake & Delaware Canal Co. v. United States,* 223 F. 926, 929 (3d Cir. 1915). We hold that this suit to cancel and annul the patent is barred by 43 U.S.C. § 1166.

## V.

## CONSTRUCTIVE TRUST AND RECOVERY OF PROPERTY VALUE

The government argues that even if it cannot bring a suit to cancel or annul the patent, Eaton either holds it in a constructive trust for the government or plaintiff is entitled to the value of the property. We disagree with both contentions.

■ In all the cases cited by the government in support of its constructive trust theory, title to the land was fraudulently obtained. *Utah v. United States (Carbon County Land Co. v. United States),* 284 U.S. 534, 52 S.Ct. 232, 76 L.Ed. 469 (1932); *Independent Coal & Coke Co. v. United States,* 274 U.S. 640, 47 S.Ct. 714, 71 L.Ed. 1270 (1927); *United States v. New*

*Orleans Pac. R. Co.,* 248 U.S. 507, 39 S.Ct. 175, 63 L.Ed. 388 (1919)[8]; *Wright-Blodgett Co. v. United States,* 236 U.S. 397, 35 S.Ct. 339, 59 L.Ed. 637 (1915); *Lockhart v. Leeds,* 195 U.S. 427, 25 S.Ct. 76, 49 L.Ed. 263 (1904); *United States v. Amalgamated Sugar Co.,* 48 F.2d 156 (10th Cir. 1931). These cases make clear, however, that a bona fide purchaser such as Eaton is not subject to a constructive trust theory. *See also So. Pac. R. Co. v. United States,* 200 U.S. 341, 353, 26 S.Ct. 296, 50 L.Ed. 507 (1906); *United States v. Detroit Lumber Co.,* 200 U.S. 321, 26 S.Ct. 282, 50 L.Ed. 499 (1906).

The government argues that there is no difference between fraud and mistake for purposes of applying a constructive trust theory. Plaintiff relies upon *Pan American Petroleum Corp. v. Pierson,* 284 F.2d 649 (10th Cir. 1960) and *Boesche v. Udall,* 373 U.S. 472, 83 S.Ct. 1373, 10 L.Ed. 2d 491 (1963) in order to support its proposition. We find these cases to be inapposite to the government's theory in this case.[9] On the contrary, we find it of great significance that a constructive trust theory is never applicable against a bona fide purchaser, and is generally applied only in cases of fraud, unconscionable conduct, or wrongdoing. *See Scott on Trusts* § 465 and 465.1 (1967). Neither Eaton nor the patentee had notice of the government's alleged "mistake" at the time the patent was issued. Application of a constructive trust theory to overcome the effect of the statute of limitation requires a balancing of equities. In this case involving a unilateral "mistake" by the government, the equities lie with the defendant, particularly in view of its status as a bona fide purchaser.

In our view, the government cannot recover the value of the property from either the original patentee or Eaton. The government relies on *Whited and Wheless, supra,* in support of this contention. We believe that in cases of mistaken issuance of

a patent to a patentee without actual or constructive notice of the "mistake," the government's *right* of action is totally barred by the statute of limitation. *See Chandler-Dunbar, supra,* 209 U.S. at 450, 28 S.Ct. 579, wherein mistaken issuance of a patent was involved. *Whited and Wheless, supra,* 246 U.S. at 563, 38 S.Ct. 367, only excluded cases of bad faith or fraud from the full effect of the *Chandler-Dunbar* doctrine. In any event, it is clear that the government can recover only from the fraudulent procurer of the patent, and not from Eaton, a bona fide purchaser. *Whited and Wheless, supra,* 246 U.S. at 560, 38 S.Ct. 367.

Because Potter, the original patentee, did not act fraudulently or with actual or constructive notice of the government's alleged "mistake," the government cannot recover from his estate. Moreover, even if the rationale of *Whited and Wheless* were extended to permit the government to recover from the procurer of a patent in cases of mistaken issuance of patents, the government cannot prevail here. The government has been unable to trace the proceeds of the sale of the patented land by Delos Potter through his estate or the estates of his heirs several times removed. In addition, we find that it is both impracticable and unconscionable, particularly when the equities are weighed, to impress a constructive trust upon the original patentee (or on his heirs) in this case, who was innocent of any wrongdoing.

In summary, therefore, the government is precluded from obtaining title to the land or from recovering the value of the land from any of its past or present patent holders.

## VI.

## ESTOPPEL AND LACHES

As an independent ground for our decision that the government cannot

---

8. While *New Orleans* does not clearly appear to involve fraud, the Court explicitly held that the bona fide purchasers (those who purchased land without constructive notice of the Homestead Act of 1887) were not subject to the constructive trust theory.

9. Those cases involved the scope of authority of the Secretary of the Interior to cancel an oil and gas lease. *Boesche* reversed the position of the Tenth Circuit, which had held that a court order was required in order to annul or cancel an oil and gas lease.

avoid the effect of the statute of limitation in this case, we hold that the government is estopped from asserting the invalidity of the patent. The action taken by the government in granting the patent, and the consistent course of administrative conduct from the mid-1930's to the early 1960's, are persuasive grounds for application of the doctrine of estoppel.

The court is not unmindful that estoppel of the government is an extraordinary remedy, especially as it relates to public lands, and is to be applied with the greatest care and circumspection. After careful consideration of the facts inherent in the litigation, we believe that estoppel is both proper and appropriate in this case.

"The doctrine of equitable estoppel binds the government for the conduct of its agents while they are acting within the scope of their employment." *Atlantic Richfield Co. v. Hickel*, 432 F.2d 587, 591 (10th Cir. 1970). *See United States v. Wharton*, 514 F.2d 406, 412–413 (9th Cir. 1975); *Fox v. Morton*, 505 F.2d 254, 256 (9th Cir. 1974); *C. F. Lytle Co. v. Clark*, 491 F.2d 834, 838 (10th Cir. 1974); *Brandt v. Hickel*, 427 F.2d 53, 56–57 (9th Cir. 1970); *United States v. Georgia-Pacific Co.*, 421 F.2d 92 (9th Cir. 1970); *McKay v. Wahlenmaier*, 96 U.S.App. D.C. 313, 226 F.2d 35, 43 (1955); *Chapman v. El Paso Nat. Gas Co.*, 92 U.S.App.D.C. 154, 204 F.2d 46, 53–54 (1953); *Davis, Administrative Law of the Seventies* § 17.01 (1976); *Estoppel Against the Government; Have Recent Decisions Rounded the Corners of the Agent's Authority Problem in Federal Procurements?*, 45 Fordham L.Rev. 497 (1976); Comment, *Emergence of an Equitable Doctrine of Estoppel Against the Government—The Oil Shale Cases*, 46 Colo. L.Rev. 433 (1975); Berger, *Estoppel Against the Government*, 21 U.Chi.L.Rev. 680 (1954).

The government is immune from estoppel only in the case of illegal or unauthorized acts of its agents. *Federal Crop Ins. Co. v. Merrill*, 322 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947); *United States v. San Francisco*, 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050 (1940); *Utah Power & Light Co. v. United States*, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917). In the instant case, Interior officials were acting within the scope of their authority and in accordance with their prescribed duties. The government has also failed to establish its claim of mistake of law by its agents. Further, all procedures were properly followed by the patent applicant.

In addition to estoppel, the doctrine of laches is a viable and persuasive defense in this case. As stated in *Roberts v. Morton*, 549 F.2d 158 (10th Cir. 1977), "[laches] . . . is an affirmative defense requiring a showing of lack of diligence by plaintiff and prejudice to the defendant." *See also Costello v. United States*, 365 U.S. 265, 282, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961); *Bradley v. Laird*, 449 F.2d 898, 902 (10th Cir. 1971).

> [The] elements [of laches] are (1) full knowledge of the facts, (2) unreasonable delay in assert[ing] [an] available remedy, and (3) . . . reliance by and prejudice to another. *Herald Co. v. Seawell*, 472 F.2d 1081 (10th Cir. 1972).

*Irwin v. West End Development Co.*, 481 F.2d 34, 39 (10th Cir. 1973).

Here it is admitted that the government had full knowledge of the facts necessary to cancel and annul the patent at the time of its issuance. All the documents upon which the patent was based were available to and considered by the issuing governmental authorities.

As an alternative to cancellation of the patent, the government requests equitable relief in the nature of a constructive trust or recovery of the land's value. Under the facts of this case, a legitimate equitable defense of estoppel and laches counterbalances the equitably based attack of the government.

The passage of twenty-one years before Defendant's patent was attacked strongly supports a defense based on laches.

> No excuse for failing to learn the facts earlier than 1928 is set forth in the amended complaint. Discovery does not mean resort at leisure to known sources of information. Possession of the means

of knowledge is tantamount to knowledge itself. *One having reasonable opportunity at hand for knowing essential facts will not be heard to assert they were unknown.* The statute (43 U.S.C. § 1166) cannot be tolled in the circumstances by the naked allegation that the facts were fraudulently concealed and suppressed. The government seeks to circumvent the self-imposed bar to the institution of a suit . . . more than six years after the date on which the patent issued. To do that, *it must specifically allege facts showing that its failure to act within the prescribed period was not due to negligence or want of diligence on its part in ascertaining the facts.* (emphasis supplied)

*United States v. Christopher,* 71 F.2d 764, 765–766 (10th Cir. 1934). We hold that the government has unreasonably delayed bringing this action even after Interior changed its policy in 1958–1962. The government was not precluded from asserting its rights to the land at any time after the issuance of the patent. Such a delay has resulted in detriment to Defendant. Eaton has relied upon Plaintiff's authorized and unequivocal issuance of the patent. Defendant has expended substantial sums of money in order to maintain and use the land for development purposes. Moreover, the passage of an entire generation has placed Eaton at a disadvantage in defending this suit, because of the unavailability of witnesses, difficulty in locating essential documents, and inability to reconstruct facts over the past quarter of a century.[10]

## VII.

### ABANDONMENT

 We reject the government's argument that the January 12, 1929, quit claim deed executed by DeBeque to the government constituted an abandonment or relinquishment of the Gem Claims by DeBeque. This basis for relief was first raised in the government's trial brief and in oral argument at the time of trial. This theory was neither presented in the Complaint filed in 1972 nor in the Pretrial Order entered by the Court in April, 1974. "The pretrial order 'measures the dimensions of the lawsuit, both in the trial court and on appeal.' *Hodgson v. Humphries,* 454 F.2d 1279, 1281 (10th Cir. 1972)." *American Home Assurance Co. v. Cessna Aircraft Co.,* 551 F.2d 804 at 806 (10th Cir. 1977).

Nevertheless, to put the matter to rest, we consider whether abandonment has been established. It is significant that in the contest proceedings which were held after the January 1929 quit claim deed had been executed, the government did not claim abandonment. The only ground for claim nullification alleged in those proceedings was that DeBeque had failed to perform assessment work, and that it had therefore forfeited its claims.

Proof of failure to perform assessment work depends on lack of compliance with a statutory requirement. Abandonment, on the other hand, is dependent upon the intention of the locator. *Farrell v. Lockhart,* 210 U.S. 142, 28 S.Ct. 681, 52 L.Ed. 994 (1908).

The contest proceedings that were the subject of *Gabbs Exploration Co. v. Udall,* 114 U.S.App.D.C. 291, 315 F.2d 37 (1963) charged both non-performance of assessment work and abandonment. The *DeBeque* contest proceedings, filed two months after those of *Gabbs,* charged only that assessment work had not been performed. We find that the government deliberately drew a distinction between pressing contest charges on the grounds of failure to perform assessment work *and* abandonment (*Gabbs*), on the one hand, and simply relying on the charge of failure to perform assessment work (*DeBeque*), on the other.

It is difficult to determine the intent of DeBeque to maintain an interest in the property more than 47 years ago. Indeed,

---

**10.** Indeed, the government's theory of this case compels Eaton to defend a murky situation of a half-century ago.

one of the purposes of the statute of limitation and of our application of the principles of estoppel against the government is to insure that such issues can be finally settled. *See* Parts IV and VI, *supra.* We find that the intent of DeBeque to abandon the claims is questionable in light of the fact that DeBeque sold and conveyed these claims for valuable consideration to Joseph Bellis on June 28, 1935 (abstract entry No. 46 at BLM 047 [Patent File]). Bellis is a predecessor in title to Eaton. When the patent was issued by the government in 1951, no impediment was asserted or recognized by the GLO on the basis of abandonment.

Abandonment is a question of fact, and the claimant's intent must be determined from all the evidence. The burden of proof of the intent to abandon rests upon the party who asserts it, and the proof must be clear and convincing. *United States v. Cowan,* 396 F.2d 83 (2d Cir. 1968); *Friedman v. United States,* 347 F.2d 697 (8th Cir.), *cert. denied,* 382 U.S. 946, 86 S.Ct. 407, 15 L.Ed.2d 354 (1965); *Allard Cattle Co. v. Colo. & So. Ry. Co.,* 530 P.2d 503 (Colo. 1974); *Commissioners v. Blanning,* 479 P.2d 404 (Colo.App.1970); *Hoff v. Girdler Corp.,* 104 Colo. 56, 88 P.2d 100 (1939); 2 *American Law of Mining,* § 8.1A at 194–195 and 8.4 at 202 (1975). We hold that the government has not established its theory of abandonment of the claim by DeBeque or other predecessors in Eaton's title.[11]

## VIII.

## CONCLUSION AND ORDER

In conclusion, we hold that:

(a) United States Land Patent No. 1131391 is a valid patent. It was properly issued by authorized government employees pursuant to a proper application by the patentee. Moreover, there was no mistake in the issuance of such patent. A change of government policy that occurred more than ten years later cannot operate retroactively to create a mistake in the issuance of the patent.

(b) No ground exists for cancellation of the patent or recovery of money by the government. The government is estopped from asserting that the underlying claim was invalid, where the issuance of the patent was in accordance with appropriate procedures and policies that were in effect at the time of issuance, and the decision was based upon a consideration of all the facts surrounding the claim. Issuance of a patent creates a presumption that all requisites for the issuance of the patent have been fully complied with. This presumption has not been overcome by the government in this case.

(c) The original claimant neither abandoned nor relinquished the mining claims. The 1931 adverse contest decision had no effect upon the validity of the claims.

(d) The government is barred by 43 U.S.C. § 1166 from bringing this suit to cancel or annul the patent.

(e) Defendant Eaton Shale Company is a bona fide purchaser. As such, the government can neither impose a constructive trust upon it in order to retain title to the land, nor recover the value of the land from it.

(f) The government cannot recover the value of the land from the original patentee (Delos Potter) and his heirs, where he did not attempt to commit fraud upon the government. Moreover, the money he received from Eaton could not be traced through his estate or those of his heirs.

(g) The doctrine of laches is applicable against the government, and bars this action. Twenty-one years elapsed from the time of issuance of the patent to the filing of the Complaint herein. Defendants have been prejudiced, both in terms of substantial expenditures on the patented land and

---

11. The government claims that the unrecorded quit claim deed operated as an automatic relinquishment to the government, even if abandonment is not proven. We disagree. However, even if DeBeque's interest in the land reverted to the government, the government subsequently treated DeBeque and its successors in interest as having once again entered the land, thereby recognizing a valid claim which ultimately gave rise to a patent.

by loss of evidence, as a result of the government's delay in bringing this suit. All information necessary for determining the validity of the patent has been known to the government since 1949, when the patent application was filed. Moreover, more than eight years elapsed from the time the government officially changed its policy with regard to patenting oil shale claims that had been the subjects of adverse contest proceedings to the filing of the Complaint. The government's inordinate delay in bringing this suit is inexcusable.

Accordingly, we hereby find the issues joined in favor of Defendant Eaton Shale Company and against Plaintiff, United States of America. The Clerk of the Court is directed to enter judgment for Defendant Eaton Shale Company and all other Defendants, and against Plaintiff on all claims. Defendants shall receive their costs as may be awarded under applicable law.

This opinion constitutes our findings of fact and conclusions of law.